RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0109p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

V&M STAR STEEL,

*Plaintiff-Appellant,*

*v.*

No. 10-3584

CENTIMARK CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 07-03573—George J. Limbert, Magistrate Judge.

Argued: June 7, 2011

Decided and Filed: April 25, 2012

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Eric W. Richardson, VORYS, SATER, SEYMOUR & PEASE LLP, Cincinnati, Ohio, for Appellant. John P. Liekar, Jr., YUKEVICH, MARCHETTI, LIEKAR & ZANGRILLI, P.C., Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Eric W. Richardson, Daniel J. Buckley, VORYS, SATER, SEYMOUR & PEASE LLP, Cincinnati, Ohio, Janice T. O'Halloran, STEFANSKI & ASSOCIATES, LLC, Youngstown, Ohio, for Appellant. John P. Liekar, Jr., YUKEVICH, MARCHETTI, LIEKAR & ZANGRILLI, P.C., Pittsburgh, Pennsylvania, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. V&M Star Steel ("V&M") filed suit against
Centimark Corporation ("Centimark") alleging breach of contract and negligence after

an incident at its steelwork facility.  The district court[1] granted summary judgment in favor of Centimark, ruling that V&M failed to produce sufficient evidence of causation to sustain either legal claim.  Because genuine issues of material fact exist, we **REVERSE** the grant of summary judgment for Centimark and **REMAND** for trial.

## I.  BACKGROUND

In 2006, V&M entered into a contract with Centimark to replace part of the corrugated steel roof at V&M's plant in Youngstown, Ohio.  The contract by its express terms consisted of multiple documents, including the "Construction Services Agreement" ("the Agreement"), the exhibits with attachments that were referred to in the Agreement, and Centimark's "Final 2006 Roof Project Proposal" ("the Proposal") dated May 9, 2006.

In Article I.1 of the Agreement, the parties agreed that Centimark would perform the work described in the Proposal, and the parties referred to that work throughout the remainder of the Agreement as "the 'Services.'"  The Services included removing and replacing roofing materials, installing flashing, and cleaning on certain designated portions of the roof.  Article VIII.1 of the Agreement stated that "[t]he standard of care for all Services provided by [Centimark] to [V&M] shall meet or exceed industry standards used by members of the construction industry practicing under similar conditions at the same time and locality."  Centimark warranted that it had the capability, experience and means necessary to perform the services to the standard of care stated and in accordance with the terms of the Agreement.  Art. VIII.4.

In addition to specifying the standard of care Centimark must meet in performing the Services, the Agreement also required Centimark to observe V&M's strict written safety standards.  Those standards were found in Exhibit II to the Agreement, called the "Invitation to Bid Specifications," and in Attachment C to that exhibit.  Section 2.6, titled, "Safety," specified that "[s]trict adherence by [Centimark] personnel to all site . . . regulations is mandated."  Section 2.6.1 stated that Centimark "shall abide by the V&M

---

[1]The case was heard by a magistrate judge with the consent of the parties.

Star Construction Safety Program" and section 2.6.2 provided that Centimark "shall provide" a signed "Contractor Safety Agreement." In Section 4.9.1, Centimark agreed to perform all work "in such a manner so as not to disturb continuing operations at the facility" because no "shut down or outage, beyond those required for routine maintenance of the operating facilities, is planned for the duration of the project." Section 4.9.6 provided that Centimark "shall protect all plant utilities in the Work area. Any utility damaged by [Centimark] shall be immediately repaired, replaced or restored to service at [Centimark's] expense." Section 4.9.7 provided that Centimark "shall repair or replace in kind any damage by [Centimark] to [V&M's] structures not included in the scope of Work, at no cost to V&M Star." Section 4.9.8 provided that Centimark "shall take all necessary precautions for the protection of life and property during its construction activities. [Centimark] shall be responsible for maintaining the integrity and stability of adjacent structures . . . resulting from its construction activities."

Section 26.1 of Attachment C to the "Invitation to Bid Specifications" set forth numerous "Contractor Safety and Environmental Requirements" V&M required Centimark to follow. Section 26.1 mandated that "[m]aterials shall be stored and stacked in a manner that prevents sliding, falling, or collapsing." V&M granted Centimark, its employees, and agents reasonable access to the facility to perform the Services only if they complied with V&M's safety rules and regulations. Article II.2; Article VIII.6.

Finally, the parties agreed that Centimark "shall be solely responsible for the acts and omissions of its employees," as well as others working under Centimark's direction in performing the services. Art. VIII.5. Centimark agreed to indemnify and hold V&M harmless from and against any and all damages incurred by V&M as a result of Centimark's negligence or breach of the Agreement. Art. IX.2. In the "Contractor Safety Agreement" included as part of the contract, Centimark agreed to comply with all V&M safety rules and regulations and acknowledged that failure to comply with V&M's safety rules "shall be grounds for . . . recovery of damages."

After the contract was executed, Centimark received at V&M's facility bundles of various lengths of corrugated steel roofing panels manufactured by Flexospan. Each

bundle contained approximately 30 panels of roof sheeting. The longer panels were approximately 21 feet by 6 feet and weighed around 90 pounds each. The bundles were secured by boards clamped with metal bands. Each bundle weighed between 2,500 and 3,000 pounds.

On Sunday, July 23, 2006, Centimark employees used a crane to lift the bundles onto those areas of the roof to be replaced, known as A-Bay, B-Bay, and C-Bay. The roof slope increased from a 3/12 pitch at A-Bay to a 4/12 pitch at C-Bay. On B-Bay and C-Bay, Centimark employees secured the bundles to the roof by screwing "kickers" to the perlins in the areas where the bundles were placed parallel to the roof line. Each bundle was secured by two kickers. On A-Bay, however, no kickers were used, and the bundles were placed perpendicular to the roof line.

V&M utilizes an overhead crane in A-Bay as part of its normal melt shop operations. The crane is positioned directly below the roof of A-Bay where Centimark staged the bundles without kickers.

Centimark employees started replacing the roof as soon as the bundles were staged. On Thursday, July 27, 2006, employees of both Centimark and Ohio Valley Sheeting and Painting were working on V&M's roof in different areas. Ohio Valley had performed roofing work for V&M for years, but it lost the bid for the roof replacement project to Centimark. Around 12:20 p.m., Centimark employees quit work due to rain. The record does not show what time Ohio Valley employees quit work that day. Around 7:00 p.m., a number of roof sheeting panels fell from A-Bay into one of V&M's electrical substations located directly below. V&M lost all power to its plant for more than 30 hours. V&M's damages for electrical repairs and lost profits was around $3 million.

After the power went out, Larry Collins, a V&M millwright, and Eric Crowl, of V&M security, climbed onto the roof to be sure that no more panels would fall onto the men working below at the substation. Collins testified it was obvious to him that one bundle of roofing panels had slid down A-Bay so that the bottom board securing the bundle was trapped in the gutter, and some of the panels were stopped at the gutter, but

the top board to secure the panels was missing so that the rest of the panels made it to the substation directly below.  Collins found only a few panels from the bundle left on the roof.  Collins did not observe any panels coming all the way out of other bundles staged on the roof, but he testified that "almost every bundle that was up there was shifting down. . .[;] this was the only one that actually let go."  Noticing that some of the bands on the bundles were broken, Collins and Crowl remarked to each other that they hoped the rest of the bundles would stay on the roof.

Collins further testified that it appeared the roofers walked off the job when it started to rain without putting away materials or equipment, and "nothing was secured." Believing that gravity or the wind had caused the panels to slide from the roof into the substation, Collins tied rope around two smaller bundles of unsecured roofing panels that were sitting up on a ledge.  He and Crowl also tied down a generator.

Rusty Myers, Centimark's operations manager, testified consistently with Collins. Myers and Centimark's project foreman, Mike Helms, returned to V&M's plant shortly after the incident.  V&M's roofing project manager, Justin Littleton, instructed Myers to secure the loose panels that remained on the roof.  Myers testified that "[d]irectly above the substation you could see more of that bundle of panels sticking into the gutter up on the roof."  Myers and Helms gathered the remaining panels from the bundle that slid, pulled them back from the low roof, and put them in a more secure place on the roof.  Myers did not have any kickers to secure the other bundles on A-Bay, so he removed some of the metal bands from the bundles and screwed them across the corners of the bundles to secure them to the roof.

During deposition, V&M's counsel showed Myers photographs depicting stressed bands on bundles that appeared to be moving downhill on the roof. When asked if he observed that condition while he was on the roof, Myers answered, "I may very well have.  It's normal; it's not abnormal."  Myers acknowledged that a band would break if a bundle "was on such a steep slope that the panels were to creep to a point" that the band was stressed. When asked, "See the bundles out of its banding; is that normal also?" Myers responded, "I've seen it before, but not – that's not as common as the

previous picture." Myers testified that he had "most definitely" seen sheets or panels coming out of bundles, but he stated that the bundles could have arrived from the factory that way. He thought it "just peculiar" that the bands on the bundle at A-Bay did not appear to be damaged and that the panels from that bundle had "been wiggled or slid out."

Myers later provided Centimark with an affidavit that is inconsistent with his deposition testimony and with other evidence produced by Centimark. In the affidavit, Myers averred:

> 12. At all times the bundles were completely intact and the metal straps were secure and tight. No bundle, or individual panel within a bundle, exhibited any evidence of shifting, sliding or otherwise moving from the place where any particular bundle was staged on the roof. There were never any reports that a bundle/strap was loose or that any bundles/panels were sliding or moving. . . .
>
> 16. It is not necessary to secure bundles until metal straps are removed which does not occur until a roofing crew is ready to begin roofing in the area where the bundle is staged. Once a bundle is opened it is secured by a kicker and, if all panels in the opened bundle are not used immediately, additional methods are used to secure the panels overnight.
>
> 17. On July 27, 2006 the subject bundle had not been opened and it was staged in an area where CentiMark crews were not working and would not be working for approximately another week.

Centimark produced the expert report of Larry Bajek, a Centimark engineer. Bajek stated that "[t]here are no national or local standards, practices or customs for the storage and placement of corrugated panel bundles on a roof. The staging of materials in process is left up to the site conditions and the individual installation companies." Bajek also stated that "[u]ntil the packaging is removed, the panels are secure and do not require kickers or any other restraining device to prevent sliding." Bajek reported that "[p]hotographs and testimony demonstrate that the metal straps around the bundle at issue remained intact, although at least two of the boards from under the strapping had been displaced[,]" which he opined required intentional force to remove. Testing done for Centimark by PSI showed that, if one board was removed from a bundle, the panels

remained secure and could not be moved with normal human force. After a second board was removed, the panels could be moved with normal human force, but did not slide by gravity. After a third board was removed, "the panels slid by gravity, in a similar fashion to what was found at the accident site." Bajek stated that "PSI's testing confirms that an intentional act was required to compromise the manufacturer's binding of the bundles and that a removal of the boards, as seen at the accident site, would cause the panels to slide." Centimark asserted that a third party, possibly one or more Ohio Valley employees, tampered with the bundle at issue, but Centimark acknowledged in its briefing in the court below that the sabotage theory was speculation.

During their investigation, V&M's safety director, Chad McClimans, and Justin Littleton considered whether any of three factors caused the panels to slide from the roof based on the way the bundles were staged: wind, vibration from V&M's overhead crane in A-Bay, or the acts of some person. They ruled out wind because the National Weather Service reported the wind at only eight miles per hour on the evening of the incident, but they did not rule out the other two possibilities. McClimans firmly believed that vibration of V&M's overhead crane in A-Bay caused the panels to slide on the roof. He did not believe that anyone would commit sabotage to put people at risk and cause the amount of damage that occurred.

V&M produced an expert report and affidavit from Daniel C. Mester, a lifelong member of the Iron Workers Local 17. Mester had forty years of pertinent experience installing metal roof sheeting. In his opinion, Centimark should have used kickers or some type of restraining device to secure the bundles staged on A-Bay because the use of kickers is a "normal and common procedure" any time material is placed on a sloped surface. Mester explained that the metal bands could not be relied upon to prevent panels from sliding out of bundles because the bands can stretch or weaken during transit from the manufacturer and when the bundles are lifted by crane to the roof. He noted that vibration from V&M's overhead crane in A-Bay, wind, and precipitation all added to the constant force of gravity so that the "natural tendency is for the sheeting to want to move downhill." Mester stated that, "[f]rom the photos I was shown, this is exactly

what happened." He opined that the absence of kickers on A Bay "is what allowed the sheeting to slide off the roof." Like Centimark's expert, Bajek, Mester also stated that the panels would slide downward as soon as the bands were cut. In Mester's opinion, Centimark did not set up the job properly because kickers should have been used on all roof levels.

After the incident and before allowing work to continue, V&M required Centimark to state in writing the preventative measures it planned to follow to secure material on the roof. Centimark agreed, among other things, to use one kicker on each perpendicular bundle and to secure old panels and opened new bundles at the end of each work day "to prevent wind uplift."

On cross-motions for summary judgment, the district court determined that the contract contained conflicting terms on the standard of care Centimark was required to meet. Construing the ambiguity against V&M, the court ruled that Centimark could not be held strictly liable for the damages V&M suffered. *V&M Star v. Centimark Corp.*, No. 4:07CV3573, 2009 WL 5943241, at *11 (N.D. Ohio Feb. 4, 2009). The court also held that V&M was not entitled to an inference of negligence under the doctrine of *res ipsa loquitur* because the roof was not under Centimark's exclusive control at the time of the incident. *Id.* at *16. The court also ruled that the expert opinion of Daniel Mester for V&M was inadmissible. *Id.* at **17-19. Finally, the court concluded that V&M could not prevail on the breach of contract or negligence claims because it did not produce any direct evidence of causation and there was no circumstantial evidence from which a reasonable factfinder could conclude that Centimark caused the injury to V&M. *Id.* at *20. The court denied V&M's motion for summary judgment on the breach of contract claim and granted Centimark's motion on both claims.

## II.  STANDARD OF REVIEW

We review the grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the non-moving party. *See Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010). Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue

as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  While the mere existence of a scintilla of evidence in support of the non-moving party is insufficient to defeat a motion for summary judgment, the court may deny the motion if the record contains evidence from which a jury could reasonably find for the non-moving party. *Id.* at 252.

## III.  ANALYSIS

Because V&M brought the case under diversity jurisdiction, state law governs the substantive issues and federal law governs the procedural issues, including evidentiary rulings made pursuant to the Federal Rules of Evidence.  *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425–26 (6th Cir. 2009).  Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach.  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (applying Ohio law); *Logsdon v. Ohio N. Univ.*, 587 N.E.2d 942, 946 (Ohio Ct. App. 1990).  The elements of negligence are: (1) the existence of a duty; (2) breach of the duty; and (3) an injury proximately resulting from the breach.  *Jeffers v. Olexo*, 539 N.E.2d 614, 616 (Ohio 1989).

## A.  The contract was not ambiguous

We do not agree that the contract between V&M and Centimark contained ambiguous terms.  In performing the actual work—that is, removing and replacing roofing materials, installing flashing, and cleaning—Centimark agreed to "meet or

exceed industry standards used by members of the construction industry practicing under similar conditions at the same time and locality." The parties dispute what those industry standards are, as we discuss below. Wholly separate from the standard of care in performing the Services, however, is Centimark's agreement to follow V&M's mandatory safety rules which were designed to protect people and structures in the work area and prevent any unnecessary plant shutdown while the roofing work was underway. Centimark agreed to store and stack materials in a manner to prevent them from sliding or falling, and Centimark covenanted to protect V&M's plant utilities. These mandatory safety requirements are easily harmonized with the standard of care for performing the actual work because V&M imposed the different standards to address different concerns.

Nonetheless, V&M cannot hold Centimark strictly liable for the damages incurred because Centimark accepted contractual responsibility to pay the cost to repair damage that Centimark *caused*. *See* Agreement, Article IX.2 (indemnity for damages arising from negligence or breach "by Contractor"); Invitation to Bid Specifications, § 4.9.6 ("Any utility damaged by the Contractor"); § 4.9.7 ("any damage by the Contractor"). Whether Centimark caused the damages by failure to follow V&M's safety rules and/or by failure to perform the roofing work in a manner meeting or exceeding industry standards are the central disputed factual issues in the case. Under Ohio law, V&M must prove causation by a preponderance of the evidence in order to recover the claimed damages, especially lost profits, as a result of breach of contract or negligence. *See Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883, 887 (Ohio 1984) (contract); *Pacher v. Invisible Fence of Dayton*, 798 N.E.2d 1121, 1128 (Ohio Ct. App. 2003) (negligence).

In the present procedural posture, we are concerned with whether V&M presented sufficient evidence, taken in its favor, to warrant a jury trial on the disputed issues. We conclude that V&M met its summary judgment burden. We consider first whether the testimony of V&M's expert, Daniel Mester, is admissible and then turn to other evidence V&M produced.

**B. Mester's expert opinion is admissible**

We review the question whether expert testimony was properly excluded for abuse of discretion. *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009). A district court abuses its discretion if it predicates a ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Id.*

Each party presented expert reports and affidavits concerning whether there were any industry standards applicable to staging corrugated panel bundles on a roof. Centimark's engineer, Larry Bajek, opined that there are no national or local standards, practices, or customs governing the storage and placement of bundles on a roof. He averred that the individual installation company determines how roofing materials will be staged, depending on site conditions.

V&M's expert, Daniel Mester, averred to a reasonable degree of certainty based on his forty years of experience installing metal roofs that kickers are always used to secure roofing materials when they are placed on a sloped surface, regardless of roof pitch. In his opinion, Centimark's foreman and job superintendent did not properly set up the job because kickers or some other type of restraining device should have been used to secure the perpendicular bundles staged on A-Bay.

Federal Rule of Evidence 702(a) provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the expert's technical or "other specialized knowledge" will help the jury understand the evidence or determine a fact in issue. Mester was qualified by knowledge, skill, experience, and training to give reliable opinion testimony about the frequency and necessity of kicker use in the metal roofing industry. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). Mester's opinion was relevant because it would assist the jury in deciding the parties' dispute regarding the existence and application of industry standards. *See id.* By excluding Mester's testimony in its entirety, the district court precluded V&M from supporting its claims and meeting Centimark's expert testimony.

The district court next focused on Mester's statement in his report: "As soon as the bands are cut, when you go to put them down they are going to want to slide down." The court ruled this testimony was not relevant under Federal Rule of Evidence 104(b)[2] because V&M had not produced any evidence that the metal bands around the bundle in question had been cut; instead, the evidence indicated the metal bands on the bundle were still intact.

Mester's statement was not considered in its proper context. Mester explained that kickers are used when placing materials on a sloped surface because "[a]s soon as the bands are cut" the panels in the bundles "are going to want to slide down." Mester did not state or imply that the metal bands on the bundle at issue had been cut; rather, he simply described what ordinarily occurs if metal bands are cut while the bundle sits unsecured on a sloped surface. V&M was not required to present proof that the bands had been cut on the bundle in question as a condition for the admission of Mester's expert testimony. Mester's explanation, based on his extensive knowledge and experience in the industry, would have assisted the jury in understanding the force of gravity on the roofing panels.

Next, the district court excluded Mester's opinion because it "has no factual basis for causation" 2009 WL 5943241, at *18, but we disagree. Mester averred that kickers are necessary to secure bundles on the roof because metal shipping bands become weak during transportation and cannot be relied upon to prevent panels from sliding out of bundles. Mester stated: "Vibration from the overhead crane, wind and precipitation all add to the constant force of gravity. The natural tendency is for the sheeting to want to move downhill. From the photos I was shown, this is exactly what happened." In other words, based on the facts made known to him, Mester concluded, based on his knowledge and experience, that the metal bands no longer resisted gravity's effect on the panels and, because they were placed perpendicular to the roof line, they slid downhill

---

[2]Rule 104(b) provides: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."

toward the gutter.  Mester added:  "The absence of [kickers] on A Bay is what allowed the sheeting to slide off the roof" and into the substation.

"Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge."  *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000).  Expert opinion can also be based on an inference and can embrace an ultimate issue.  Fed. R. Evid. 704(a).  The district court faulted Mester's opinion because he did not take any frequency measurements from the roof during mill operations to determine the amount of vibration on the roof of A-Bay, nor did he make any calculations based on weather reports.  The court further believed that Mester's statements were inadmissible because they "lack any indicia of probability and are mere comments on possibility."  2009 WL 5943241, at *18.

We do not interpret Mester's report in the same way.  He was not required to develop scientific measurements to support his opinion that gravity caused the panels to slide.  "So long as the Earth rotates on its axis, the law of gravity is certain.  While the law of gravity prevails, it is also certain that an unsupported object will fall until its travel is interrupted by some object or surface below."  *Busch v. Unibilt Indus., Inc.*, No. 18175, 2000 WL 1369891, at *3 (Ohio Ct. App. Sept. 22, 2000); *Szotak v. Moraine Country Club, Inc.*, 872 N.E.2d 1270, 1276–77 (Ohio Ct. App. 2007) ("Until the law of gravity is repealed, standing above ground level on a ladder presents an inherent risk of injury resulting from a fall."); *Holdshoe v. Whinery*, 222 N.E.2d 435, 438 (Ohio Ct. App. 1966) ("If no restraint was put on a motor vehicle parked on an incline, gravity would cause the motor vehicle to roll down the incline at an accelerating speed.").  Jurors do not need to hear expert scientific evidence to determine causation, and the court admitted as much.  2009 WL 5943241, at *19.  But jurors must be allowed to hear relevant evidence, and they can understand from their own  life experience that objects set on a slope will move downward with the force of gravity unless restrained.  *See Ramage v. Central Ohio Emergency Serv., Inc.*, 592 N.E.2d 828, 833 (Ohio 1992) ("[M]atters of common knowledge and experience, subjects which are within the ordinary, common

and general knowledge and experience of mankind, need not be established by expert opinion testimony.").

Under the Federal Rules of Evidence, the standard for relevance is "extremely liberal." *See Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is admissible under Federal Rule of Evidence 402. Mester's opinion helps V&M establish that, had Centimark installed kickers on A-Bay, it is more probable that the panels would not have fallen into the substation when gravity pulled them downward. Therefore, his opinion is relevant, admissible evidence. We believe the court's expressed concerns bear on the weight the jury may give Mester's opinion at trial, not on its admissibility. *See Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 182 (6th Cir. 2009). Accordingly, we conclude that the exclusion of Mester's expert opinion was an abuse of discretion.

## C. Summary judgment was not appropriate

A jury trial is warranted because genuine issues of material fact exist on this record. V&M produced evidence to show the existence of a contract, V&M's performance of the contract, Centimark's breach of it, and resulting damages to V&M. *See Savedoff*, 524 F.3d at 762; *Logsdon,* 587 N.E.2d at 946. Construing the facts in the light most favorable to V&M, a reasonable jury could find that Centimark breached contract provisions requiring it to store materials away from edges to prevent objects from falling, to protect V&M's utilities, and to work in a manner so as not to disturb the continuing operations of V&M's facility.

V&M also produced evidence of negligence in that Centimark owed V&M a duty, Centimark breached the duty, and injury to V&M proximately resulted from the breach. *See Jeffers*, 539 N.E.2d at 616. We agree with the district court that V&M is not entitled to an inference of negligence based on the doctrine of *res ipsa loquitur* because V&M did not establish one of the necessary prerequisites, that being "the instrumentality causing the injury was, at the time of the injury, or at the time of the

creation of the condition causing the injury, under the exclusive management and control of" Centimark. *See Hake v. George Wiedemann Brewing Co.*, 262 N.E.2d 703, 705 (Ohio 1970). Nonetheless, despite V&M's inability to produce an eye witness to the incident, it produced sufficient circumstantial evidence to justify a jury trial on negligence.

Contrary to the district court's view, causation is not "left to utter speculation." 2009 WL 5943241, at *21. Collins testified that, when he and Crowl climbed to the roof after the power outage, they found the roof in disarray. It appeared the roofers had left in a hurry due to the rain and failed to secure materials and equipment to the roof before they left. The bundle of panels on A-Bay directly above the substation appeared to have slid downward where the bottom board of the bundle came to rest in the gutter. Although the metal bands were intact, Collins reported that the upper boards were missing, only a few panels remained on the roof, and the rest of the panels had fallen into the substation. At deposition, Myers confirmed that photographs depicted other staged bundles moving downhill on the roof, stressing the metal bands, and he agreed such movement is a normal occurrence, although he retreated from that testimony when he filed a subsequent affidavit.

The expert evidence tends to confirm the lay witness testimony that gravity caused the unsecured panels to slide. Centimark's expert, Bajek, acknowledged that the panels are secure in the packaging—protective boards and metal bands—until the packaging is removed and Collins's testimony makes clear that some packaging boards were removed from the bundle in question. In addition, PSI's testing for Centimark confirmed that, after a third board is removed from a bundle, the panels will slide by gravity "in a similar fashion to what was found at the accident site." This evidence, combined with Mester's expert testimony for V&M, points to gravity as a likely cause of the bundle's movement on the roof and the lack of kickers as the reason why the panels continued to slide off the roof and into the substation. And while evidence of subsequent remedial measures—like Centimark's use of kickers on A-Bay after the incident—is not admissible to prove negligence or culpable conduct, it may be

admissible for impeachment or, if disputed, the feasibility of precautionary measures. Fed. R. Evid. 407.  Finally, a question for the jury remains as to whether the panels escaped the bundles due to manufacturer error, a combination of rain and vibration, or other external force.  Even if the missing boards could have been removed from the bundle only by intentional force, as Centimark argues, a jury question remains as to whether it is more probable that Centimark employees removed the boards and failed to secure the panels before leaving work for the day or whether Ohio Valley employees committed sabotage against V&M, a theory Centimark both offered and acknowledged to be nothing more than its own speculation.  All of these possibilities must be submitted to a jury for resolution on the disputed evidence as a whole.  *See Bourjaily v. United States*, 483 U.S. 171, 179–80 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts.").

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255; *Bobo v. UPS, Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). Having carefully reviewed the record, we are convinced that a jury trial is warranted.

## IV.  CONCLUSION

For all of the reasons stated, summary judgment in favor of Centimark should not have been granted.  Accordingly, we **REVERSE** the judgment in favor of Centimark and **REMAND** for trial.