RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY,

*Plaintiff-Appellee*,

*v.*

NORCOLD, INC.,

*Defendant-Appellant*.

No. 15-6410

Appeal from the United States District Court for
the Eastern District of Kentucky at Covington.
No. 2:14-cv-00132—William O. Bertelsman, District Judge.

Argued: October 16, 2016

Decided and Filed: February 22, 2017

Before: GILMAN, GIBBONS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David T. Schaefer, DINSMORE & SHOHL LLP, Louisville, Kentucky, for
Appellant. Kenneth D. Dunn, BARNETT, PORTER & DUNN, Louisville, Kentucky, for
Appellee. **ON BRIEF:** David T. Schaefer, Ryan A. Morrison, DINSMORE & SHOHL LLP,
Louisville, Kentucky, for Appellant. Kenneth D. Dunn, BARNETT, PORTER & DUNN,
Louisville, Kentucky, for Appellee.

STRANCH, J., delivered the opinion of the court in which GIBBONS, J., joined.
GILMAN, J. (pp. 11–14), delivered a separate dissenting opinion.

—————————

## OPINION

—————————

JANE B. STRANCH, Circuit Judge.  This diversity case involves claims that straddle the line between tort and contract and requires determination of the scope of Kentucky's economic loss rule. The damages at issue were incurred when an RV refrigerator manufactured by Norcold overheated and caused a fire that destroyed the RV.  The district court held that the economic loss rule as adopted in Kentucky does not prohibit State Farm from bringing a tort claim against Norcold.  We **affirm**.

## I.  BACKGROUND

This case turns on applicability of the economic loss rule to consumer transactions in Kentucky.  The economic loss rule prevents a plaintiff from recovering in tort for damage caused by a defective product when the only damages are to the product itself and consequential damages such as lost profits; it requires any recovery for those types of damages to be sought through contract claims.  Norcold stipulated that it was responsible for the damage to the RV if the economic loss rule did not apply, then appealed and moved to certify questions about the doctrine's scope to the Supreme Court of Kentucky.

### A.      Factual History

The parties stipulated to the facts in this case.  Norcold manufactured the refrigerator in question in 2007.  That same year, the refrigerator was installed by manufacturer Tiffin into a 2007 Phaeton model recreational vehicle (RV).  The refrigerator came with a three-year express limited warranty.  The RV was bought by its original purchaser that same year.  In 2010, Norcold issued a recall on this model of refrigerator.  The recall notice informed owners that they should immediately stop using their refrigerators and have repairs done to add a temperature-monitoring controller to help prevent overheating that could result in a fire.  The recall repairs were performed on this RV by a third-party authorized service center in 2011.  The RV was still owned by the original purchaser at the time of the recall notice and repair work.

In 2012, Larry Swerdloff purchased the used RV. Swerdloff had no contact with Norcold when he bought the RV, and the three-year warranty had expired by its terms prior to Swerdloff's purchase. Swerdloff insured the RV through State Farm.

In September 2013 a fire caused by the refrigerator destroyed the RV in Pendleton County, Kentucky. The fire did not cause any personal injuries, but the RV and its contents were a total loss. State Farm paid $145,193.20 to Swerdloff under the insurance policy. Norcold has stipulated that it owes State Farm $145,193.20 if the economic loss rule does not apply to the consumer transaction in this case.

### B.          Procedural History

State Farm filed suit against Norcold in Kentucky state court in 2014. Norcold removed the case to federal court based on diversity jurisdiction. The district court denied Norcold's motion for partial summary judgment and held that the Supreme Court of Kentucky would not apply the economic loss doctrine to consumer transactions. *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 89 F. Supp. 3d 922, 928 (E.D. Ky. 2015). Norcold moved for interlocutory appeal of that order. The district court ordered briefing on whether the question should be certified to the Supreme Court of Kentucky. Following briefing, the district court denied the motion for interlocutory appeal and declined to certify the question of law to the Kentucky court.

To expedite a final appealable judgment, Norcold stipulated to conditional liability and the amount of damages while reserving the right to appeal the question of whether the economic loss rule should apply in this action. State Farm moved for summary judgment, which the district court granted. Norcold appealed the final judgment and moved to certify questions of law to the Supreme Court of Kentucky.

## II. ANALYSIS

### A.          Standard of Review & Applicable Law

We review grants of summary judgment de novo. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). "Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)).

As a federal court exercising diversity jurisdiction, the choice-of-law rules of the forum state, Kentucky, determine what substantive law to apply. *NILAC Int'l Mktg. Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004). The parties stipulate that Kentucky law applies. There is a reasonable basis for this stipulation, as the damage in this case occurred with a fire in Kentucky and there is a "provincial tendency in Kentucky choice-of-law rules." *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000).

### B.          Economic Loss Rule in Kentucky

In *Giddings & Lewis, Inc.*, the Supreme Court of Kentucky adopted the holding of the U.S. Supreme Court that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 738 (Ky. 2011) (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986) (applying admiralty law)). Recognizing that, at the time, "virtually all states appl[ied] the rule in some form," *id.* at 736, the Kentucky court adopted the economic loss rule in the commercial context, thus preventing a "purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself." *Id.* at 733. It also concluded "that such damages must be recovered, if at all, pursuant to contract law." *Id.*

*Giddings & Lewis* involved a large machine that consisted of a turning lathe, two machining assemblies, and a material handling system. *Id.* at 734. The machine had been custom made by Giddings & Lewis for the purchaser, Ingersoll Rand, which had provided detailed specifications. *Id.* The two parties negotiated a written contract that included an express warranty. *Id.* Seven years after the system was installed and after the warranty had expired, part of the lathe flew off the machine and caused approximately $2,800,000 in damage to the machine. *Id.* The insurers of Ingersoll Rand brought tort claims against Giddings & Lewis arguing, as pertinent here, that: 1) Kentucky should not adopt the economic loss rule and 2) if it did, a "calamitous event" exception should be recognized. *Id.* at 735.

*Giddings & Lewis* traced the history of the economic loss rule in Kentucky beginning with application of the doctrine in a commercial transaction context by the Kentucky Court of Appeals in *Falcon Coal Co. v. Clark Equipment Co.*, 802 S.W.2d 947 (Ky. App. 1990). The Kentucky Supreme Court declined to review that case but expressed skepticism about the doctrine a few years later by noting in dicta that the *Falcon Coal* holding was too broad. *Real Estate Marketing, Inc. v. Franz*, 885 S.W.2d 921, 926 (Ky. 1994) (saying "[w]e do not go so far as the Court of Appeals . . . in *Falcon Coal*, . . . limiting recovery under a products liability theory to damage or destruction of property 'other' than the product itself."). The Sixth Circuit interpreted the dicta in *Franz* as "probably answer[ing] in the negative the question of whether the economic loss doctrine applies to consumer purchases in Kentucky." *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848–49 (6th Cir. 2002).

*Giddings & Lewis* acknowledged that the dicta in *Franz* was "not altogether clear" and suggested either that: 1) there is an exception to the doctrine for damaging events, or 2) Kentucky would not apply the doctrine to consumer transactions. 348 S.W.3d at 737. The court overruled *Franz* "[t]o the extent *Franz*'s alluded-to limitation of *Falcon Coal* can be read to suggest that a commercial purchaser can recover economic losses under a strict liability theory if a destructive event damages the product itself." *Id*. at 741. The second possible interpretation—that the economic loss doctrine did not apply to consumer transactions—was not directly addressed by the court. Instead, the court observed in a footnote:

> The case *sub judice* does not require us to consider the effect of the economic loss rule on consumer transactions but, notably, the Restatement (Third) of Torts: Products Liability makes no distinction between products produced for commercial customers and those produced for consumers. *See* Restatement (Third) of Tort § 19(a) (1998) defining 'product' in relevant part as 'tangible personal property distributed commercially for use or consumption.'

*Id*. at 737 n.5.

Holding that the economic loss rule applies in the commercial context, the Kentucky Supreme Court then undertook a discussion of the "principles underlying" the rule and its application to the facts presented. *Id*. at 738.

1.  Policies Underlying the Economic Loss Rule

*Giddings & Lewis* listed the policies supporting the economic loss rule as: 1) maintaining the distinction between tort and contract law; 2) protecting the freedom to contractually allocate economic risk; and 3) encouraging the party best situated to assess the risk of economic loss to insure against that risk.  *Id*. at 739 (quoting *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  We therefore use those policies as the framework for analyzing Norcold's argument that Kentucky's economic loss rule extends or should extend to consumer transactions.

a)  Preserving the Line Between Tort and Contract Law

The first policy—preserving the line between tort and contract law—can apply in both commercial and consumer settings. Kentucky law, however, has drawn the distinction between tort and contract differently depending on whether a transaction is in a commercial or consumer context.  *See, e.g.*, Ky. Rev. Stat. § 367.120 *et seq.* (Kentucky Consumer Protection Act); Ky. Rev. Stat. § 355.2-102 (exempting statutes regulating sales to consumers from modification by Article II of the UCC).[1]

b)  Ability to Allocate Risk via Contract

The second policy—protecting freedom to allocate risk by contract—has different implications in the contexts of commercial and consumer transactions.  Parties engaging in commercial transactions are generally sophisticated and have relatively equal bargaining power. Barkley Clark & Christopher Smith, *Law of Product Warranties* § 1:12 (rev. ed. 2016).  Such parties engage in active negotiations that permit meaningful allocation of risk.  Consumers, on the other hand, are usually less sophisticated—one cannot specialize in every product one purchases—and bargain with unequal power when negotiations actually do occur.  Consumers frequently face adhesion contracts that render the purchase of products a take-it-or-leave-it

---

[1]The dissenting opinion warns of "contract law . . . drown[ing] in a sea of tort" if tort relief is available for purely economic losses.  (Dissenting Op. 12) (quoting *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 592 N.W.2d 201, 209–10 (Wis. 1999)).  But the status quo in Kentucky is that the economic loss rule does not extend to consumer transactions.  It is under this circumstance, which maintains both tort and contract areas of law, that insurers and purchasers have negotiated insurance contracts, including the one between Swerdloff and State Farm at issue in this case.

proposition.  In many cases, moreover, consumers are unaware of the risks inherent in a product, let alone the opportunity to allocate that risk by contract.

Manufacturers and sellers select warranty terms, but consumers have little or no opportunity to engage in negotiations over those warranty terms and consumers often have few meaningful alternatives for other products or different contracts.[2]   Though some producers provide warranties to instill confidence in particular products and as a selling point over competitors, many producers disclaim all warranties in the fine print of contracts that consumers never read.   And while there may be information provided concerning certain risks when a warranty is marketed, those risks otherwise remain unidentified.   That dynamic creates its own information asymmetry as producers may strategically select when to make risk information available or understandable to consumers and when to bury it in fine-print adhesion contracts.   In the many situations where there is no back-and-forth between the parties, it is difficult to allocate risk in accordance with parties' preferences.   Albert Choi & George Triantis, *The Effect of Bargaining Power on Contract Design*, 98 Va. L. Rev. 1665, 1701 (2012).

*Giddings & Lewis* dealt with a more typically commercial transaction that involved active negotiation and a written contract between the parties.  348 S.W.3d at 734.  In this case, the consumer had no interactions or contract with the producer.  (R. 11, PageID 62)  Although contractual privity is not always a requirement of the economic loss doctrine, *Mt. Lebanon Personal Care*, 276 F.3d at 852, this case exemplifies common features of consumer transactions—the unequal positions of the parties and the lack of opportunity to negotiate.  These inherent distinctions support treating consumer transactions differently than commercial transactions.  In cases like this where consumers have no contact with the producer, let alone negotiations or a written contract, Norcold's argument that the freedom to contract will be infringed absent application of an economic loss rule is simply misplaced.

---

[2]Manufacturers and third parties do sometimes offer for purchase extended warranties on durable consumer products, though such policies themselves are opaque or unavailable for review.

c) Encouraging Best-Situated Party to Insure Against Risk of Loss

The third policy—encouraging the party best situated to assess risk of economic loss to insure against it—also differs between the commercial and consumer contexts. In commercial transactions, purchasers are typically sophisticated parties that are well informed about both the product and its intended use. In that context, the purchaser is usually well situated to assess the risk of economic loss because it knows how it will be using the product and what it expects of the product. Perhaps this is why the Supreme Court of Kentucky described the party best situated to assess the risk of economic loss as "usually the purchaser" when discussing a commercial transaction in *Giddings & Lewis*. 348 S.W.3d at 739 (quoting *Mt. Lebanon*, 276 F.3d at 848). Not only can commercial purchasers make an informed decision about how to properly insure the product, they usually have adequate insurance options available. In the consumer context, however, there is often a large information and capacity asymmetry between the seller who specializes in the field and the purchasing consumer who is necessarily a generalist. Although the consumer may best know what she wants to do with the product, the seller usually has substantially better information about what to expect of the product's performance and what consequences might flow from that performance. Consumers are unlikely to understand the risks inherent in the product's use and even if they did, they may not have insurance options available to insure against that risk.[3] In this context, the producer is probably in the better position to select proper liability insurance.

2.        Other Indications from the Supreme Court of Kentucky

Despite the cases referenced and the policy arguments explicated above, Norcold argues that the Supreme Court of Kentucky would extend the economic loss rule to consumer transactions. First, it notes that footnote five in the *Giddings & Lewis* opinion directs the reader to the relevant section of the Restatement (Third) of Torts that does not distinguish between commercial and consumer transactions. *Id*. at 737 n.5. Though this dicta explicitly declines to

---

[3]The dissenting opinion points out that Swerdloff was able to adequately insure his RV through State Farm. (Dissenting Op. 14) This is most likely a result of the circumstances in this case; the product in question—a refrigerator—was installed as a component part of a larger durable product—an RV—that was insured. Extending the economic loss rule to all consumer transactions sweeps up many circumstances involving everyday products and smaller durable products—including stand-alone refrigerators—that are less likely to involve adequate insurance options for consumers.

rule on the matter, Norcold argues it indicates that the court might treat the two contexts similarly. It also argues that Kentucky would extend the economic loss rule to consumer transactions because that it is the majority position among the states. *See* Frumer & Friedman, *Products Liability* § 13.07(4) (rev. ed. 2015) (listing fifteen states that apply the doctrine to consumer transactions and two states that explicitly do not). Norcold relies on the fact that the Supreme Court of Kentucky previously looked at sister courts to determine the appropriate scope of the economic loss rule. *Giddings & Lewis*, 348 S.W.3d at 739 (noting "a majority of our sister courts do not recognize the [calamitous event] exception," but also disclaiming that "[o]ur position is not a matter of deference to the majority view or the nation's highest court but rather a matter of logic").

We draw a different conclusion. First, as explained above, two of the three policies espoused by the Supreme Court of Kentucky as underlying the economic loss rule justify treating commercial and consumer transactions differently. Kentucky's highest court, moreover, has provided two signals supporting this conclusion. When the Supreme Court of Kentucky announced the economic loss rule in *Giddings & Lewis*, it could have used broad language that would encompass consumer transactions. The court chose not to do so. Instead, its opinion regularly described the rule as applying to a "commercial purchaser," 348 S.W.3d at 733, to a "product sold in a commercial transaction," *id.*, to a "manufacturer in a commercial relationship," *id.* at 738, and to "commercial transactions." *Id.* Likewise, the court could have disagreed with the Sixth Circuit's assessment that Kentucky case law justified not extending the rule to consumer transactions, but instead cited the Sixth Circuit opinion with general approval. *See id.* at 739.

A second indication that the Supreme Court of Kentucky would not extend the economic loss rule to consumer actions is its general skepticism of the rule. The rule was not announced in Kentucky until 2011, twenty-five years after the foundational case on the matter from the U.S. Supreme Court. *See id.* at 733 (citing *East River Steamship*, 476 U.S. 858 (1986)). At that point, Kentucky was joining "virtually all states" in recognizing the doctrine. *See id.* at 736. In an area of law where the Kentucky courts are generally skeptical, we are wary of expanding the scope of

the rule based on unclear dicta in a single footnote, particularly in light of Kentucky's other jurisprudence on the issue.

We conclude that the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions.

### C.       Applicability of Doctrine to Recalls

State Farm claims that even if the economic loss rule applies to consumer transactions, Norcold can be held liable for post-sale negligence by failing to conduct an effective recall. In light of our holding that the economic loss rule does not apply to consumer transactions, we do not decide whether the rule applies to recalls and claims for post-sale negligence.

### D.       Motion to Certify Questions to the Supreme Court of Kentucky

Norcold has moved to certify two questions to the Supreme Court of Kentucky: 1) whether the economic loss rule applies to consumer transactions; and 2) whether the rule extends to claims arising from product recall programs. Because we perceive adequate indications that the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions, we find it unnecessary to certify the questions.

### CONCLUSION

Based on the jurisprudence on this issue in Kentucky and because the policies underlying the economic loss rule justify treating commercial and consumer transactions differently, we hold that the economic loss rule does not extend to consumer transactions. We therefore **affirm** the judgment of the district court. Norcold's motion to certify questions to the Supreme Court of Kentucky is denied.

—————————

**DISSENT**

—————————

RONALD LEE GILMAN, Circuit Judge, dissenting.   Unlike my panel colleagues, I believe that the Kentucky Supreme Court is more likely than not to extend the economic-loss rule to consumer transactions.   I draw this conclusion based on footnote five in *Giddings & Lewis*, the policy considerations behind the economic-loss rule, the opinions rendered by the overwhelming majority of other state courts that have ruled on the issue, and the facts of the case before us.   At the very least, this case cries out for certification of the issue to the Kentucky Supreme Court.   I would therefore reverse the judgment of the district court and grant Norcold's motion to certify.   Accordingly, I respectfully dissent.

I would first observe that the majority opinion presupposes its own conclusion by stating that "the status quo in Kentucky is that the economic loss rule does not extend to consumer transactions." (Maj. Op. 6 n.1)   To the contrary, the rule's application to consumer transactions is very much up in the air, which is precisely why we have been tasked with making an "*Erie* prediction" in this case.   And the best evidence before us concerning what the Kentucky Supreme Court would likely do about the issue before us is found in footnote five of *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729 (Ky. 2011).   Without deciding the question, the Kentucky Supreme Court in that footnote dropped a conspicuous hint as to which direction it would lean:   "notably," the Court wrote, "the Restatement (Third) of Torts . . . makes no distinction between products produced for commercial consumers and those produced for consumers." *Id.* at 737 n.5.   A natural reading of the text of the footnote—which, although not binding, is nonetheless rather clear—strongly suggests that the Kentucky Supreme Court is amenable to applying the economic-loss rule to consumer transactions, and would probably do so if given the opportunity.

The majority opinion denigrates the persuasive force of footnote five by stating that "[w]hen the Supreme Court of Kentucky announced the economic loss rule in *Giddings & Lewis*, it could have used broad language that would encompass consumer transactions." (Maj. Op. 9) To the contrary, the Kentucky Supreme Court is constrained to decide only those issues that are

before it and could not rule on the question of the economic-loss rule's application in the *consumer* context in *Giddings & Lewis*—a commercial-transaction case—because it is "prohibited from producing mere advisory opinions." *See Med. Vision Grp., P.S.C. v. Philpot,* 261 S.W.3d 485, 491 (Ky. 2008).

That the Kentucky Supreme Court would go out of its way to say *anything* about the economic-loss rule in the consumer context in a decision concerning commercial transactions makes footnote five stronger, not weaker, evidence that the Court would extend the rule to the consumer context. This conclusion is further bolstered by the fact that as many as fifteen states have recognized the rule's applicability to consumer transactions and only two explicitly have not—a trend that we have no reason to suppose the Kentucky Supreme Court would buck. *See* Frumer & Friedman, *Products Liability* § 13.07(4) (rev. ed. 2015).

Nor do the three policies identified in *Giddings & Lewis* as justifying the economic-loss rule support the distinction between commercial and consumer transactions as claimed by the majority. First, distinguishing between commercial and consumer transactions blurs the line between tort and contract, an outcome that flies in the face of the Kentucky Supreme Court's admonition that the economic-loss rule is designed to "maintain[] the historical distinction between tort and contract law." *Giddings & Lewis*, 348 S.W.3d at 739 (quoting *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). This point was aptly noted by the Wisconsin Supreme Court: "[W]hether a consumer or commercial plaintiff, if tort law were allowed to provide tort relief for purely economic loss, contract law would drown in a sea of tort." *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co. (Wisconsin Ford Motor Case)*, 592 N.W.2d 201, 209–10 (Wis. 1999). *See also Clarys v. Ford Motor Co.*, 592 N.W.2d 573, 575 (N.D. 1999) ("The separate and distinct functions served by tort and contract law, upon which the economic loss doctrine is based, apply equally to consumer and business purchasers of defective products."); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 572 N.W.2d 321, 324–25 (Minn. 1997) (concluding that the economic-loss rule applies to consumer transactions and collecting cases from other jurisdictions). My panel colleagues concede that this particular policy goal is furthered by the economic-loss rule's application to

both types of transactions (Maj. Op. 6), but they fail to account for the deleterious effect their decision will have on maintaining the tort-contract distinction.

Second, I fail to see how not applying the economic-loss rule to consumer transactions furthers the rule's goal of protecting "parties' freedom to allocate economic risk by contract." *See Giddings & Lewis*, 348 S.W.3d at 739 (quoting *Mt. Lebanon*, 276 F.3d at 848). My panel colleagues opine that ordinary consumers, whom they characterize as "less sophisticated" than commercial entities, "frequently face adhesion contracts that render the purchase of products a take-it-or-leave-it proposition. In many cases," they contend, "consumers are unaware of the risks inherent in a product, let alone the opportunity to allocate that risk by contract." (Maj. Op. 6–7)

But the experience of today's consumer is at variance with this picture. Manufacturers and sellers regularly encourage extended warranties on durable products. Insurance is also available, as the case before us illustrates. And, as the Wisconsin Supreme Court has observed, permitting tort recovery for pure economic loss to a consumer would ensure that the consumer "would essentially receive full warranty protections against economic risk without ever having to negotiate or pay for such warranty." *Wisconsin Ford Motor Case*, 592 N.W.2d at 211; *see also Clarys*, 592 N.W.2d at 576 ("Allowing a consumer exception to the economic loss doctrine would undermine warranty agreements that are part of any product sale."). Such an outcome deprives the manufacturer or seller of the ability to allocate economic risk by contract—a result precisely the opposite of what the economic-loss rule sets out to achieve.

Third, the Kentucky Supreme Court has explained that the economic-loss rule is meant to "encourage[] the party best situated to assess the risk of economic loss, *usually the purchaser*, to assume, allocate, or insure against that risk." *Giddings & Lewis*, 348 S.W.3d at 739 (emphasis added) (quoting *Mt. Lebanon*, 276 F.3d at 848). The facts of this case illustrate the emphasized clause's importance. The majority opinion asserts that ordinary consumers are too "generalist" (Maj. Op. 8) to be best situated to assess the risk of loss and insure themselves accordingly. I respectfully disagree. Although ordinary consumers are often "generalists" in a broad sense, they are nonetheless specialists in their own needs and are fully capable of protecting their investments to the degree that they desire to do so.

This case is a perfect example. Larry Swerdloff, presumably an unsophisticated "generalist" consumer, bought the RV containing the defective refrigerator and—as my panel colleagues observe—"insured the RV through State Farm." (Maj. Op. 3) The majority's concern that consumers are unable to accurately assess the value of a product and the importance of insuring against the risk of the loss of its economic value is thus belied by the facts of the very case before us. *See Wisconsin Ford Motor Case*, 592 N.W.2d at 212 ("Because the consumer can allocate his or her economic risk by contract, the policy of protecting parties' freedom to allocate risk through contract applies equally to consumers as to commercial parties.").

I would offer the final observation that this case is not about an ordinary consumer and his ill-fated transaction. Swerdloff was paid $145,193.20 per his State Farm insurance policy for the loss of the RV. So what we have before us is the case of a commercial insurance company suing a commercial manufacturer in tort for a pure economic loss. That fact alone places this case squarely within the three policy rationales justifying the application of the economic-loss rule. *Giddings & Lewis*, 348 S.W.3d at 739 (quoting *Mt. Lebanon*, 276 F.3d at 848).

The majority's decision, in fact, has the effect of allowing State Farm to "have its cake and eat it too." State Farm collected insurance premiums from Swerdloff for the risk it assumed and is now being allowed to "double dip" by getting reimbursed from Norcold after making good on Swerdloff's loss. Such an outcome is at odds with the policies behind the economic-loss rule.

In my opinion, the factors supporting the prediction that the Kentucky Supreme Court would extend the economic-loss rule to consumer transactions outweigh the factors against such a prediction. I would therefore reverse the judgment of the district court and grant Norcold's motion to certify the two questions that it has proposed to the Kentucky Supreme Court.