**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0929n.06

**No. 11-1679**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Aug 21, 2012***

LEONARD GREEN, Clerk

KATHRYN MATTESON, aka Kathryn Matteson )
Klein, )
            )
        Plaintiff-Appellant, )
            )
v. )  On Appeal from the United States
            )  District Court for the Eastern
NORTHWEST AIRLINES, INC., )  District of Michigan
            )
        Defendant-Appellee. )

Before:      BOGGS, GILMAN, and DONALD, Circuit Judges.

BOGGS, Circuit Judge. Kathryn Matteson slipped and fell in Detroit's Metropolitan Wayne County Airport. She suffered a broken right hip and sustained damage to her right rotator cuff. Matteson filed this premises-liability suit, alleging that the party responsible for the terminal, Northwest Airlines, negligently failed to maintain a safe premises. The district court granted summary judgment for Northwest, holding that the substance that caused Matteson's fall was an open and obvious danger as a matter of law. Because the record, construed in Matteson's favor, could support a contrary finding by a reasonable jury, we reverse.

I

Matteson was in the Detroit Metropolitan Wayne County Airport on September 17, 2009, waiting for her flight back to Florida, where she lived. With her were two co-workers, Joe McGrath

and Eric Meiners. The three arrived at the airport early, spent some time at a "sky club" where Matteson had a glass of wine, and ate dinner at an airport restaurant. After dinner, they went together toward their respective gates. McGrath and Meiners walked together, talking. Matteson walked ahead of them.

As she proceeded on a tiled area between two moving walkways that she was traversing, Matteson slipped and fell. "I was just walking looking ahead, looking for my gate," she testified, "then all of a sudden I'm down." Matteson, embarrassed, tried "to jump up," but "couldn't move." She "looked around to see if [she] fell on something, and there was a clear substance . . . it was thick . . . [and] clear." Matteson testified that she did not see the substance before she fell.

Meiners, McGrath, and Danny Minton, a bystander who saw the fall, came to Matteson's aid. None of the three noticed the substance before Matteson fell; all noticed it afterward. Meiners testified that, when he saw Matteson fall, his "line of sight went right to [Matteson]." About a second later, when he was a step away from Matteson, his "gaze broadened" and he saw the substance. McGrath did not see the substance until he "got to Matteson," but he testified that he could not have seen it from a distance because Matteson's body would have blocked his view. Minton, who was walking toward Matteson from the opposite direction, saw Matteson "step off of the moving sidewalk . . . . At that time [he] did not notice any spill. However, [he] did see her take a couple steps . . . and slip on something, fell very hard [sic]. [He] then noticed that there was something on the ground."[1]

_____

[1] The witnesses' testimony on the color of the substance is not consistent. Matteson testified that it was clear; Meiners and McGrath testified that it was light green, like Mountain Dew or

Meiners and McGrath helped Matteson to a chair in a gate-side waiting area, called for medical assistance, and notified two Northwest Airlines employees of the substance on the ground. The employees, Meiners testified, said that they already knew about the spill. Minton went to Matteson, asked if she was hurt, said that he saw what happened, and gave Matteson his contact information. A woman in a restaurant or retail uniform[2] also approached Matteson, expressing her sympathy and explaining that "she had told someone to clean [the substance] up twenty minutes ago and they still hadn't cleaned it up." The woman in uniform then got paper towels and started to clean the substance. According to McGrath, the woman "was covering a much bigger area [with paper towels] than the area of moisture that I saw when I first went to assist [Matteson]." McGrath could, however, "see that there was moisture" where Matteson fell from ten to fifteen feet away. Eventually, an airport cleaning crew cleaned the area.

Matteson filed this suit in the United States District Court for the Eastern District of Michigan, alleging that Northwest Airlines caused her injuries by its failure to maintain a safe premises. After discovery, the district court granted summary judgment for Northwest. It reasoned that, because Meiners, McGrath, and Minton were all able to see the substance after Matteson fell, the substance qualified as an open-and-obvious hazard under Michigan law. In addition, the

---

Gatorade; Minton testified that it was light red. For purposes of summary judgment, we must take the facts in the light most favorable to the non-moving party. Thus, we assume that the substance was clear, since a clear substance is usually more difficult to see than a substance with color. The factfinder, of course, is free to reach a different conclusion.

[2] It does not appear that the woman was a Northwest Airlines employee. Rather, she seems to have worked for an airport vendor.

substance did not pose a special risk of harm that would excuse Matteson's failing to notice it.

Accordingly, the district court held, Matteson's suit could not proceed. Matteson appeals.

II

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "We review the grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the non-moving party." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine where "the record taken as a whole could . . . lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under this standard, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The moving party, however, ultimately bears the burden of proving that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

III

"Because jurisdiction in this case is predicated on diversity, the substantive law of the forum state—here, Michigan—applies." *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012). Under Michigan law, the party responsible for a premises generally "owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition." *Lugo v. Ameritech Corp., Inc.*, 629 N.W.2d 384, 386 (Mich.

2001). If, however, a condition is "so obvious that the invitee might reasonably be expected to discover [it], an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee." *Ibid.* (quoting *Riddle v. McLouth Steel Prods. Corp.*, 485 N.W.2d 676, 681 (Mich. 1992)). This principle, known as the open-and-obvious doctrine, is "an integral part of the definition of [the] duty" that an invitor owes its invitee. *Ibid.* Put simply, it means that an invitor has no duty to protect its invitee from an open and obvious danger, unless that danger has special aspects that make it particularly likely to cause harm.

A hazard qualifies as "open and obvious" if "an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection[.] That is, is it reasonable to expect that the invitee would discover the danger?" *Novotney v. Burger King Corp.*, 499 N.W.2d 379, 381 (Mich. Ct. App. 1993). Even an open and obvious hazard, though, can lead to liability, if there are "special aspects of the open and obvious condition that differentiate the risk from typical open and obvious risks so as to create an unreasonable risk of harm." *Lugo*, 629 N.W.2d at 387 (internal quotation marks omitted). A "special aspect," for example, might include an open and obvious hazard that is unavoidable, or a condition that "impose[s] an unreasonably high risk of severe harm." *Ibid.* In our open-and-obvious inquiry, we must "focus on the objective nature of the condition of the premises at issue, not on the subjective degree of care used by the plaintiff." *Id.* at 390.

Michigan cases on the open-and-obvious doctrine are not consistent, particularly in their application of the term "casual inspection." *Novotney* was a premises-liability claim by a woman who fell when she tried to step from the sidewalk in front of a restaurant onto a handicap-access

ramp. The Michigan Court of Appeals held that the ramp was an open and obvious danger as a matter of law because "[t]here is no indication from the record that the ramp was not in plain view or that, upon casual inspection, an ordinary user could not ascertain the nature of the incline and use the ramp with safety." *Novotney*, 499 N.W.2d at 382.

In reaching this conclusion, *Novotney* borrowed from products-liability jurisprudence. It applied the principle that a manufacturer has no duty to warn a purchaser of a danger that is "readily apparent or visible upon casual inspection and reasonably expected to be recognized by the average user of ordinary intelligence." *Glittenberg v. Doughboy Recreational Indus.*, 491 N.W.2d 208, 210 (Mich. 1992); *see also Novotney*, 499 N.W.2d at 381.[3] The *Novotney* court emphasized that the condition of the premises, not the degree of care that the plaintiff exercised, is the lynchpin of the analysis. *Ibid.*

Nine years later, the Michigan Supreme Court decided *Lugo*. There, the plaintiff suffered harm when she stepped into a pothole in a parking lot. The court held that the open-and-obvious doctrine barred the claim because the hazard was "simply . . . a common pothole in a parking lot,"

---

[3] The fit between products liability and premises liability, we note, is imperfect. In the products-liability context, it makes sense to require casual inspection, for a reasonable person will usually look at—or casually inspect—a product before using it. The same is true of some premises. An ordinary person, for instance, will look into a swimming pool before she enters the water. Floors, though, are somewhat different. People in ordinary life do not "inspect" the ground before they walk, absent some special reason to do so, such as the presence of ice or snow. Of course, a reasonable person will look where she is going. But there is a critical difference between being aware of one's surroundings and looking down at the ground while walking. This observation does not alter our analysis, since we must take Michigan law as we find it. Still, the incongruity between inspection of a product before use and inspection of the ground before walking might explain some of the inconsistency in the cases discussed below.

the plaintiff "wasn't looking down," and "there was no evidence of special aspects that made the open and obvious pothole unreasonably dangerous." *Lugo*, 629 N.W.2d at 388–90.

The *Lugo* court did not explain *why* the pothole qualified as an open and obvious danger. Rather, it used the danger at issue, "a common pothole[,] as an example . . . [of a] condition [that] is open and obvious and thus cannot form the basis of liability against a premises possessor." *Id.* at 388.[4] The court then moved to the second piece of the open-and-obvious analysis: whether the pothole that it held was open and obvious had "special aspects" that made it unreasonably dangerous. *Id.* at 388–90. *Lugo*, in short, did not address the meaning of "casual inspection" in the open-and-obvious context.

---

[4] This cursory view seems to stem from the *Lugo* court's belief that the pothole was a sufficiently common occurrence to be directly analogous to a stair that causes a plaintiff to trip and fall. *See Lugo*, 629 N.W.2d at 389 ("The present case is substantially similar to *Maurer v. Oakland Co Parks & Recreation Dep't* . . . . [where] the plaintiff slipped and fell on an unmarked cement step." (internal quotation marks omitted)). In the context of stairs, the Michigan Supreme Court had expressly held:

> [B]ecause steps are the type of everyday occurrence that people encounter, under most circumstances, a reasonably prudent person will look where he is going, will observe the steps, and will take appropriate care for his own safety. Under ordinary circumstances, the overriding public policy of encouraging people to take reasonable care for their own safety precludes imposing a duty on the possessor of land to make ordinary steps foolproof. Therefore, the risk of harm is not unreasonable. However, where there is something unusual about the steps, because of their character, location, or surrounding conditions, then the duty of the possessor of land to exercise reasonable care remains.

*Bertrand v. Alan Ford, Inc.*, 537 N.W.2d 185, 189–90 (Mich. 1995) (footnotes and internal quotation marks omitted). Thus, in stair cases, the court could normally assume—as the *Lugo* court did—that the danger was open and obvious, and focus entirely on the special-aspects analysis.

The later open-and-obvious cases that interpret these principles do not provide consistent guidance. In *Snyder v. Jack's Fruit Market*, No. 188581, 1997 WL 33354547 (Mich. Ct. App. Jan. 17, 1997), for instance, the Michigan Court of Appeals reversed and remanded a trial court's grant of summary disposition in favor of the defendant. Snyder, the plaintiff, slipped and fell on a pool of water approximately the size of a basketball that had collected on the floor in front of a meat cooler. *Id.* at *1. The Michigan Court of Appeals held that the danger was not open and obvious. It reasoned:

> [B]ecause a shopper may be distracted by product displays and promotions, or preoccupied with the search for the desired product, or other thoughts related to the shopping experience as they walk through the store, it may not be unreasonable for a shopper not to notice a puddle of water on the floor. Therefore, we consider it to be a question of fact as to whether plaintiff should have discovered the puddle of water and realized its danger.

*Id.* at *2. The *Snyder* panel, then, considered the entire context of the plaintiff's shopping experience; it did not require that she scrutinize the very area where the pool of water collected. Indeed, *Snyder* expressly disapproved the latter line of inquiry, writing: "Defendant argues that, because plaintiff stated that if she had looked she would have seen the puddle before she fell, the danger was open and obvious and defendant cannot be held liable. We disagree." *Ibid.*

In *Brooks v. Bruce Campbell Dodge, Inc.*, No. 293039, 2010 WL 3719228 (Mich. Ct. App. Sept. 23, 2010), by contrast, another panel of the Michigan Court of Appeals held that a puddle of liquid in a car dealership's service area was open and obvious. Such a puddle, the court reasoned, "is neither unusual nor unforeseeable . . . [and] if casual inspection is to mean anything, it must at a minimum mean looking at one's surroundings, even if momentarily." *Id.* at *1. Similarly, the

Michigan Court of Appeals held that "the slipping hazard posed by . . . crushed grapes or grape residue" was an open and obvious danger in *Kennedy v. Atlantic & Pacific Tea Co.*, 737 N.W.2d 179, 181 (Mich. Ct. App. 2007). There, a shopper slipped on fallen grapes. "[H]e and several other people all noticed the existence of the crushed grapes or grape residue once they actually looked at the floor." *Id.* at 182. This, the court held, "establishe[d] that [Kennedy] would have noticed the potentially hazardous condition had he been paying attention." *Ibid.* That Kennedy was a shopper in a grocery store replete with distractions did not require a different result, for "mere distractions are not sufficient to prevent application of the open and obvious danger doctrine." *Id.* at 184 (citing *Lugo*, 629 N.W.2d at 389).

Inconsistent though these cases are, we believe that they point to reversal here. First, unlike a stair step—a special category in Michigan premises-liability law—a clear spill on an airport floor is not "the type of everyday occurrence that people [regularly] encounter." *See Bertrand*, 537 N.W.2d at 189. The danger here is not, therefore, automatically open and obvious like the pothole in *Lugo*. *See Watts v. Mich. Multi-King, Inc.*, 804 N.W.2d 569, 573 (Mich. Ct. App. 2010) ("[W]e reject defendant's assertion that a wet floor in a restaurant is a common everyday hazard of which customers are expected to be aware, making it *always* open and obvious regardless of its visibility.").

The question, then, is whether "an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection." *Novotney*, 499 N.W.2d at 381. This inquiry, put differently, asks whether it is "reasonable to expect that the invitee would discover the danger?" *Ibid.* Here, Matteson and Minton walked toward each other; neither saw the substance before Matteson slipped. Meiners and McGrath walked just behind Matteson; neither saw

the substance before Matteson slipped. And while all of the witnesses were able to see the substance after Matteson fell, it is not clear whether they could see the substance only *because* Matteson had disturbed, and called attention to, the spill by stepping in it, or because the substance was indeed easily visible. *Cf. Kennedy*, 737 N.W.2d at 182 (quoting plaintiff's testimony that "[i]t was no great mystery. There were grapes on the floor"). McGrath's testimony that the woman in a restaurant uniform cleaned an area larger than the area that he believed the spill covered supports the view that the substance was visible only because Matteson disturbed it.[5] The part of the spill that McGrath was surprised to see her clean may have remained practically invisible, even though the part that Matteson stepped in was visible *because* she disturbed it when she slipped and fell. Because none of the four witnesses saw the substance before Matteson fell, and because it is not clear how much of the substance was easily visible at the time of her fall, it is not clear that an average person of ordinary intelligence traversing an airport terminal would have been able to discover the substance on casual inspection. Therefore, genuine issues of material fact remain. The district court erred by granting summary judgment to Northwest. *See, e.g.*, *Watts*, 804 N.W.2d at 573 (reversing grant of summary disposition in favor of defendant where "[d]efendant . . . offered no testimony or other

---

[5] This point, of course, could also support Northwest. If the spill were larger than just the area that McGrath saw, Northwest might argue, it would have been easier for an ordinary user to see. Nor does the placement of towels, without more, necessarily indicate the size of the spill, since one might clean a spill by placing paper towels over an area larger than the spill itself. These, though, are jury arguments. At this stage, we must draw all reasonable inferences in Matteson's favor.

evidence to demonstrate that the floor was visibly, let alone obviously, wet at the time of plaintiff's

fall or that a reasonable person would have observed that condition on casual observation").[6]

## IV

Matteson has put forward enough evidence suggesting that the substance was not open and

obvious *at the time of her accident* that a reasonable jury could find in her favor.  We REVERSE the

judgment of the district court and REMAND for further proceedings consistent with this opinion

---

[6] Because we conclude that the spill was not open and obvious as a matter of law, we do not
address the question whether the spill had any "special aspects" that made it unusually dangerous.