JOHNSON et al., Appellants,

v.

CHURCH OF THE OPEN DOOR et al., Appellees.

[Cite as *Johnson v. Church of the Open Door,* 179 Ohio App.3d 532, 2008-Ohio-6054.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 08CA009387.

Decided Nov. 24, 2008.

David A. Forrest;  and Patrick D. Riley, for appellants.

Kate E. Ryan;  James L. Glowacki and William H. Kotar;  and Jay Clinton Rice, for appellees.

DICKINSON, Judge.

## INTRODUCTION

{¶ 1} Gary McNaughton conned Rich and Trina Johnson out of over a million dollars by convincing them to invest in a Ponzi scheme and cosign on a commercial loan.  The Johnsons sued, among others, Pastor Tim Guenther and the Church of the Open Door (the "Church") because they introduced the Johnsons to McNaughton and recommended investing with him.  The trial court granted Guenther and the Church summary judgment.  Because the Johnsons were not justified in relying on what Guenther told them about McNaughton's program, this court affirms the trial court's judgment on the Johnsons' negligent-misrepresentation and fraud claims.  Because genuine issues of material fact

exist regarding whether Guenther aided McNaughton in the sale of unregistered securities and whether he was acting within the scope of his employment, this court reverses the trial court's judgment on their Ohio Securities Act claim and remands for further proceedings.

## FACTUAL BACKGROUND

{¶ 2} McNaughton is a Canadian citizen who met Church representatives at a spiritual retreat in the mid–1990s. He told them that he lived on investment income and wanted to devote himself to ministry work full time. The Church recruited him to assist with its youth ministry and helped him obtain a visa to come to the United States. At the Church, McNaughton served under Guenther as its director of activities and outreach.

{¶ 3} Church members were curious about how McNaughton could support himself on his investments. He told them that he had a friend in Canada named Andrew Lech who managed a large family trust and who was a wizard at playing the stock market. He said that Lech enjoyed helping those who did ministry work and offered to let them invest with him if they were interested. Several members of the Church, including some of its pastors, invested with McNaughton. Although Guenther did not invest with McNaughton, he knew about the program.

{¶ 4} In the late 1990s, Guenther, McNaughton, and a couple of other Church members wanted to expand the Church's footprint in the community. Seeking to minister to high school students who did not attend the Church, they purchased a barn that they thought could serve as a youth center and started a not-for-profit organization known as the Silos. They offered the Silos to community organizations as a place to hold meetings and began leading character-building classes for local schools. Although McNaughton and Guenther spent many hours at the Silos, they hired Guenther's wife to serve as its director and run most of its activities. The Silos' operating expenses were primarily underwritten by McNaughton, who made donations to the Silos out of his investment income.

{¶ 5} In 2001, Guenther received an e-mail from Johnson, who was running a youth ministry called Hot Church at a nearby community college. Because Johnson's ministry was small, he had e-mailed a number of churches in the area, looking to share resources. Guenther was the only pastor who responded. The Guenthers and Johnsons arranged to have dinner to talk about Johnson's ministry. At the dinner, Johnson told Guenther that he had retired from Microsoft, that he had substantial savings, and that he was looking for a way that he could live on his investments and minister full time. Guenther told Johnson about the activities that went on at the Silos and about McNaughton's investment program.

{¶ 6} Johnson was interested in investing with McNaughton, so he asked Guenther to set up a meeting with him. At the meeting, which Guenther also attended, McNaughton told Johnson that Lech was an expert at investing in stock options, which let him make a profit whether the market was going "up, down, or sideways." He said that depending on the size of the investment, Lech would guarantee up to 18 percent in annual returns, paid in monthly installments. He also said that because of the size of Lech's family trust, Johnson's investments would be safe unless there was a global economic meltdown. Guenther did not say much at the meeting, but did invite Johnson to move his ministry to the Silos.

{¶ 7} Following the meeting, Johnson called a couple of references that McNaughton had provided him. He then invested over $500,000 with McNaughton. When McNaughton sent him his initial interest payment, Johnson sent it back and requested that it be rolled into his principal. A few months later, he invested $40,000 more. He also obtained a $100,000 home-equity loan and invested the proceeds with McNaughton. By the end of 2002, Johnson held a promissory note from McNaughton for nearly $750,000.

{¶ 8} Johnson, meanwhile, moved his ministry to the Silos. When Guenther's supervisor at the Church learned that another church was operating out of the Silos, he became concerned. Mrs. Guenther explained to him, however, that, although Johnson's ministry was called "Hot Church," it was only a "parachurch organization" for young adults that Guenther thought could feed into the Church. In fact, a few months after Johnson moved his ministry to the Silos, he began attending the Church and sending his children to the Church's school.

{¶ 9} When Guenther and McNaughton first purchased the Silos, they entered into a land contract. Because they had problems dealing with the landowner, McNaughton thought it would be better to obtain a mortgage loan. He tried to have Guenther co-sign for the loan, but Guenther did not have enough assets. He then asked the Johnsons for help. According to Johnson, McNaughton told him that because he was a Canadian citizen, he needed them to sign the loan as character references. The Johnsons did not read the loan documents and actually signed as co-borrowers. Furthermore, although the amount owed on the land contract was less than $200,000, the loan was for $400,000. McNaughton received the extra $200,000, supposedly to fund the Silos' programs.

{¶ 10} The Johnsons received monthly payments until December 2002, when their bank refused one of McNaughton's checks. Johnson's mother, who had also invested with McNaughton, encountered a problem in October 2002, when her check bounced. McNaughton apologized to the Johnsons and blamed the Patriot Act, which he said had complicated transferring money to and from Lech. The Johnsons received payments for three more months, but did not receive any more after March 2003. The Johnsons later learned that McNaughton and Lech had

been running a Ponzi scheme and that their "interest" payments had actually been funded with other people's investments. They also discovered that they were responsible for the Silos' mortgage.

{¶ 11} The Johnsons sued McNaughton and Lech, asserting multiple claims. They sued Guenther because, according to them, he had recommended McNaughton, had trumpeted his investment plan, had made assurances about the plan, and he and his wife had benefited financially from it. They sued the Church, alleging that it did not adequately supervise the Silos, and under a theory of respondeat superior for Guenther's actions. The Church's insurance company intervened, seeking a declaratory judgment that its policy did not cover the Johnsons' claims.

{¶ 12} The Johnsons were not the only parties who sued the Church regarding McNaughton's scheme. In *Jevack v. McNaughton*, 9th Dist. No. 06CA008928, 2007-Ohio-2441, 2007 WL 1461171, at ¶ 18, this court determined that the Church was not responsible for McNaughton's acts just because he worked for it. In *Kelly v. McNaughton* (Jun. 12, 2007), Lorain County Court of Common Pleas, No. 03CV135478, the court determined that the Church was not liable for McNaughton's scheme because it did not hire him to sell investment instruments and did not participate in the sales. Citing those cases, the trial court granted summary judgment for Guenther and the Church. It also granted judgment for the Church's insurance company. The Johnsons have appealed, assigning two errors.

## STANDARD OF REVIEW

{¶ 13} The Johnsons' first assignment of error is that the trial court incorrectly granted summary judgment for Guenther and the Church because there are genuine issues of material fact in dispute that remain to be litigated. In reviewing a trial court's ruling on a motion for summary judgment, this Court applies the same standard a trial court is required to apply in the first instance: whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Parenti v. Goodyear Tire & Rubber Co.* (1990), 66 Ohio App.3d 826, 829, 586 N.E.2d 1121.

{¶ 14} The Johnsons asserted a number of claims in their complaint, including violations of the Ohio Securities Act, negligence, breach of fiduciary duty, conversion, invasion of privacy, respondeat superior, promissory estoppel, and fraudulent misrepresentation. In their brief, the Johnsons have addressed only their negligent-misrepresentation, fraudulent-misrepresentation, Ohio Securities Act, and respondeat superior claims. This court will limit its discussion to those claims. See *State ex rel. Moore v. Malone*, 96 Ohio St.3d 417, 2002-Ohio-4821, 775 N.E.2d 812, at ¶ 39 (holding that a party waived the claims she failed to pursue in her merit brief). Moreover, before this court can determine whether

respondeat superior applies, it must determine whether Guenther can be held liable. *Moncol v. Bd. of Edn. of N. Royalton School Dist.* (1978), 55 Ohio St.2d 72, 9 O.O.3d 75, 378 N.E.2d 155, syllabus ("a judgment in favor of the servant on the merits renders invalid any judgment against the master").

## JUSTIFIABLE RELIANCE

{¶ 15} The Johnsons have argued that Guenther made negligent misrepresentations and defrauded them. "[T]he elements of fraud and negligent misrepresentation are very similar." *Martin v. Ohio State Univ. Found.* (2000), 139 Ohio App.3d 89, 104, 742 N.E.2d 1198. In particular, justifiable reliance is an essential element of both. In describing liability for negligent misrepresentation, the Ohio Supreme Court has written: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis sic.) *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, quoting 3 Restatement of the Law 2d, Torts (1965) 126–127, Section 552(1). "The elements of fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Roberts v. Hagen* (Feb. 9, 2000), 9th Dist. No. 2845–M, 2000 WL 150766, at *2, quoting *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

{¶ 16} To determine whether the Johnsons' reliance was justified, "this Court must inquire into the relationship between the parties." *Lapos Constr. Co. v. Leslie* (1996), 9th Dist. No. 06CA008872, 2006-Ohio-5812, 2006 WL 3174252, at ¶ 21, citing *Crown Property Dev., Inc. v. Omega Oil Co.* (1996), 113 Ohio App.3d 647, 657, 681 N.E.2d 1343. It must "consider the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances." *Farris Disposal, Inc. v. Leipply's Gasthaus, Inc.,* 9th Dist. No. 22569, 2005-Ohio-6737, 2005 WL 3483580, at ¶ 18, quoting *Radice Partners Ltd. v. Angerman* (Jan. 16, 1991), 9th Dist. No. 90CA004861, 1991 WL 6138, at *5.

{¶ 17} Johnson testified that after he told Guenther he wanted to minister full time, Guenther told him that there was a man at his church who helped

people invest, that he had helped pastors, churches, and other ministries, and that he had been doing it for a long time. He told Johnson that he did not know how the program worked, but could have others explain it to him. At the second meeting, Guenther was present, but did not speak much. According to Johnson, although he knew Guenther was not a financial advisor, he invested with McNaughton because of Guenther's and McNaughton's credibility. He claimed they had told him that the Church's senior pastor and several other members had successfully invested and that the Church offered the investments as a way to help churches, pastors, and Christian campgrounds.

{¶ 18} According to Johnson, after he moved his ministry to the Silos, Guenther continued to promote McNaughton's investments. Guenther spoke openly about the "bags of money" that McNaughton gave him and referred to McNaughton's investment program as the "G plan." He assumed the Guenthers were part of the investment program because Mrs. Guenther had notarized some of the promissory notes he received. Johnson testified, however, that after he made his initial investment with McNaughton, he did not rely on Guenther's advice in deciding to make additional investments.

{¶ 19} The Johnsons invested over half a million dollars with McNaughton, allegedly based on Guenther's advice, even though they had just met Guenther, Guenther did not know many details about McNaughton's program, and the Johnsons knew he was not a licensed financial advisor. Even if it was reasonable for the Johnsons to think Guenther was trustworthy because he was a fellow minister, they knew he had no expertise with financial investments.

{¶ 20} Moreover, despite Guenther's recommendation, the Johnsons sought other assurances. After meeting with McNaughton, they contacted two couples who had invested with McNaughton to verify his claims. In *Christian v. McLaughlin* (Dec. 30, 1998), 9th Dist. No. 19064, 1999 WL 1579, this court concluded that the purchasers of a house did not justifiably rely on a real estate agent's representations because "[d]espite [the agent's] representations as to the wiring and plumbing, [the buyers] continued to investigate possible problems on their own and relied on the representations and work of [a] home inspector and [an] electrician. Their resort to these outside sources and the continuing suspicion of problems with the house show that any reliance on [the agent's] representations was no longer justified." Id. at *2. Similarly, despite Guenther's recommendation, the Johnsons continued to be wary about McNaughton's plan and contacted others who had invested with him. Under these circumstances, their reliance on Guenther's statements was not justified as a matter of law.

{¶ 21} Regarding the mortgage for the Silos, the Johnsons have not alleged that Guenther was involved in that transaction. While Guenther was president of the Silos and Mrs. Guenther was its director, it was McNaughton who asked the

Johnsons to cosign for the loan. Accordingly, they cannot establish that Guenther made any negligent or fraudulent misrepresentations about the loan. The trial court correctly determined that Guenther and the Church were entitled to summary judgment on the Johnsons' negligent misrepresentation and fraud claims.

## OHIO SECURITIES ACT

{¶ 22} The Johnsons have also argued that Guenther participated or aided in the sale of unregistered securities, in violation of R.C. 1707.43. R.C. 1707.43(A) provides that "every person that has participated in or aided the seller [of an unregistered security] in any way * * * [is] jointly and severally liable to the purchaser * * *." A person who has not received remuneration based on the sale, however, "shall not be deemed to have * * * participated in, or aided the seller * * *." R.C. 1707.431(B).

{¶ 23} Guenther has argued that his conduct did not rise to the level of participating in a sale. While there has not been much case law interpreting the phrase "participated in or aided the seller in any way," "it is clear that this language is broad in scope given the phrase 'in any way.' " *Federated Mgt. Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 391, 738 N.E.2d 842, quoting R.C. 1707.43(A). Guenther not only told the Johnsons about McNaughton's investment program, he arranged for them to meet with McNaughton and attended the meeting. A genuine issue of material fact, therefore, exists regarding whether he aided McNaughton in the sale of unregistered securities.

{¶ 24} Guenther has argued that he falls within the exclusion under R.C. 1707.431(B) because he did not receive remuneration based on the sale. The Johnsons, however, have presented evidence that around the time they began investing with McNaughton, Mrs. Guenther's salary at the Silos increased. Guenther testified that McNaughton, as vice-president of the Silos, was responsible for determining her salary. The Johnsons have submitted evidence that in 2000, Mrs. Guenther received $30,000 from McNaughton's investment account. They have also submitted evidence that in 2001, some of Mrs. Guenther's salary was paid directly from McNaughton's investment account. Accordingly, there is a genuine issue of material fact regarding whether Guenther received remuneration for aiding McNaughton in the sale of unregistered securities. See *Perkowski v. Megas Corp.* (1990), 55 Ohio App.3d 234, 236, 563 N.E.2d 378 (concluding that radio show host who received an advertising fee had received indirect remuneration for bringing issuers and purchasers of securities together).

{¶ 25} Guenther has also argued that the Johnsons' claim is time-barred under R.C. 1707.43(B), which provides that no action "shall be brought more than

two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful * * *." He has noted that the Johnsons were unable to cash one of McNaughton's checks in December 2002, which, according to him, gave them notice that there was a problem. In fact, he has noted that they asked McNaughton to return almost half of their principal following that incident. They did not file their complaint, however, until March 2005.

{¶ 26} Although the Johnsons had trouble cashing one of McNaughton's checks in December 2002, McNaughton's daughter was at the bank at the same time and deposited enough money into his account so that they could be paid. The Johnsons were reassured by McNaughton that the problem was only temporary because of increased regulations following passage of the Patriot Act. Although they requested that McNaughton return a large amount of their principal, their promissory note gave him four months to do so. Following the incident, they continued receiving monthly payments until April 2003. They did not fail to receive a check or have their principal timely returned until April 2003, and were not aware of a government investigation into the investment scheme until June 2003. A genuine issue of material fact, therefore, exists regarding when they knew or should have known that McNaughton's investment program was unlawful. The trial court incorrectly granted Guenther summary judgment on the Johnsons' Ohio Securities Act claim. Their first assignment of error is sustained regarding their claim against Guenther under R.C. 1707.43(A), but overruled as to their negligent-misrepresentation and fraud claims.

## RESPONDEAT SUPERIOR

{¶ 27} The Johnsons' second assignment of error is that the trial court incorrectly failed to submit the question of whether Guenther was acting in the scope of his employment to a jury. "For an employer to be liable for a tortious act of its employee, that employee must be acting within the scope of employment when [he] commits the tortious act." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, paragraph two of the syllabus. "A person is acting within the scope of his employment when: '(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.'" *Jevack v. McNaughton*, 9th Dist. No. 06CA008928, 2007-Ohio-2441, 2007 WL 1461171, at ¶ 16, quoting *Akron v. Holland Oil Co.*, 102 Ohio St.3d 1228, 2004-Ohio-2834, 809 N.E.2d 666, at ¶ 13–15 (Pfeifer, J., dissenting). "[T]he burden is on [the Johnsons] to show that [Guenther was] acting within the scope of [his] employment with the purpose to serve [the Church]." Id. "If [ ] reasonable minds can only conclude that the tort occurred outside the scope of

[Guenther's] employment, then [the Church] would not be vicariously liable to [the Johnsons] and summary judgment in its favor would be proper." Id., quoting *Wrinkle v. Cotton*, 9th Dist. No. 03CA008401, 2004-Ohio-4335, 2004 WL 1837311, at ¶ 8.

{¶ 28} The Johnsons have argued that Guenther was acting within the scope of his employment because his duties included ministering at the Silos, enlarging the footprint of the Church in the community, gaining access to public high schools, getting people involved in college and youth ministries, and getting people from the community to attend the Church. In October 2000, Guenther's supervisor approved a job description for Guenther that contained a section for community representation and outreach, including his work at the Silos. The Johnsons have argued that when Guenther mentioned the investment program to them, he was responding to their request to build a relationship with the Church and their interest in devoting themselves to practicing their ministry full time at the Silos. According to the letter Mrs. Guenther wrote to Guenther's supervisor, Guenther also thought that their ministry could serve as a feeder for the Church.

{¶ 29} Although Guenther's responsibilities did not include aiding or participating in the sale of securities, he knew that the Johnsons wanted to devote themselves to ministry work full time. He also knew that they could do so only if they could live on their investment income. Viewing the evidence in a light most favorable to the Johnsons, Guenther may have encouraged them to invest in McNaughton's program to entice them to move their ministry to the Silos and recruit them to the Church. A genuine issue of material fact, therefore, exists regarding whether he was acting within the scope of his employment when he told the Johnsons about McNaughton's investment program and aided in McNaughton's sale of unregistered securities. The trial court incorrectly granted the Church summary judgment on the Johnsons' Ohio Securities Act claim. Their second assignment of error is sustained.

## CONCLUSION

{¶ 30} Genuine issues of material fact exist regarding whether Guenther aided or participated in the sale of unregistered securities and whether he did so within the scope of his employment. The judgment of the Lorain County Common Pleas Court is affirmed in part and reversed in part, and this matter is remanded for proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

Moore, P.J., and Slaby, J., concur.