NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0141n.06

No. 13-3727

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| WILLIAM R. WRIGHT and JAYDE WRIGHT, | ) | **FILED** |
| | ) | Feb 18, 2014 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| STATE FARM FIRE AND CASUALTY | ) | COURT FOR THE |
| COMPANY, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:    GUY, GIBBONS, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  Plaintiffs William and Jayde Wright appeal the district court's grant of summary judgment dismissing their claims against defendant State Farm Fire and Casualty Company for breach of contract, misrepresentation, and bad faith.  The Wrights purchased a home in a golf-club development without researching the requirements of the homeowners' association.  They also purchased standard homeowner's insurance from State Farm without requesting additional coverage for costs arising out of the enforcement of the association's rules.  Nor did they read the policy to learn about its coverage.  When the home's roof was damaged in a storm, the association forced the Wrights to replace the entire roof pursuant to the association's design standards.  State Farm paid the Wrights the cost to repair the roof, but not to replace it, leaving the Wrights with a substantial roofing bill.  At the end of the policy term, State Farm informed the Wrights that it would not renew the policy.  The Wrights

sued State Farm for refusing to pay the full cost of the roof replacement and for declining to renew the policy. Because all of the Wrights' claims are meritless, summary judgment was appropriate.

In December 2010, the Wrights purchased a residence in Muirfield Village, an upscale golf-oriented residential community managed by the Muirfield Association. The home was subject to a number of deed restrictions enforced by the Association, including adherence to the Muirfield Design Standards, which state in relevant part: "Any roof that needs repair must be re-roofed in entirety. Partial or patch roofing is not permitted." Mr. Wright claims not to have known about this particular restriction at the time that he purchased the home.

The Wrights purchased, along with the home, a homeowner's insurance policy from State Farm. The Wrights obtained the policy through Michelle Nix at the Mike McClaskie Agency, a captive agent of State Farm. At the meeting with Nix, Wright did not discuss the Muirfield Design Standards. *Id.* Mr. Wright believes he did not receive the detailed policy pamphlet at that time, because he had to request a new policy pamphlet later during the claim process.

The policy provided coverage for "accidental direct physical loss to the property," and limited the settlement of property damage to "the cost to repair or replace with similar construction and for the same use . . . the damaged part of the property." The policy stated in its section on claim settlement that State Farm would "not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided." *Id.* The Wrights' policy included an Option OL that did provide additional coverage for costs that are increased because of "the enforcement of a building, zoning or land use ordinance or law."

About two months after the Wrights moved into Muirfield Village, a storm damaged their home's wood-shake roof. According to an affidavit submitted by the Wrights' roofer, the original wood shakes had weathered significantly over the years and the roof could not be repaired to match. Because of the Muirfield Design Standards, the Wrights had to replace the whole roof, a job that was estimated to cost over $47,000. The Wrights filed a claim with State Farm and requested payment for the entire cost to replace the roof, but State Farm offered to pay only $747.03, the cost to repair the roof minus the deductible. Mr. Wright was thus stuck footing most of the $47,000 bill to replace the roof.

Forty-five days before the Wrights' policy expired, State Farm informed them that "[t]his coverage is no longer acceptable to State Farm Fire and Casualty Company due to your overall claim activity" and that they would not renew the policy. State Farm decided not to renew because the Wrights had been reimbursed for two substantial losses in the first year of coverage. In addition to the roof claim, the Wrights had also claimed $1500 for the mysterious disappearance of a ring. After State Farm's notice of nonrenewal, Jayde Wright obtained a new policy from Liberty Mutual, which did not indicate that the Wrights would be charged a higher premium due to State Farm's nonrenewal.

The Wrights filed a complaint against State Farm in Ohio state court, alleging breach of contract for State Farm's failure to reimburse for the replacement of the wood-shake roof, misrepresentation regarding the scope of the policy's coverage, and contractual bad faith. The case was removed to the District Court for the Southern District of Ohio, where State Farm moved for summary judgment. In their response to the motion for summary judgment, the Wrights introduced a number of specific arguments in favor of their claims, including (1) that State Farm had a fiduciary duty to the Wrights; (2) that § 3901-1-54 of the Ohio Administrative

Code requires State Farm to cover the Wrights' wood-shake roof replacement; and (3) that State Farm's nonrenewal policy violated the contractual duty of good faith. The district court dismissed all of the Wrights' claims, holding that there were no genuine issues of material fact and that State Farm was entitled to judgment as a matter of law. The Wrights appealed.

Because there was no misrepresentation or bad faith on the part of State Farm, the district court properly dismissed all of the claims.

First, there was no misrepresentation regarding the actual scope of the policy's coverage, because the policy unambiguously does not cover roof replacement. The Option OL covers only laws and ordinances, which by the usual use of the terms include only rules enacted by a governmental authority. The Wrights, in contrast, were obligated to comply with a restrictive covenant, which is a private agreement. Therefore, Option OL by its clear terms does not extend to the enforcement of the restrictive covenant.

This interpretation of the coverage follows from the plain and ordinary meaning of the operative terms "law" and "ordinance." The "plain and ordinary meaning" is the touchstone for construing an unambiguous written contract under Ohio law. *See Mercer v. 3M Precision Optics, Inc.*, 908 N.E.2d 1016, 1018 (Ohio Ct. App. 2009). Ordinances and laws are characterized by their being created and enforced by a governmental authority. For example, *Webster's Third* defines an "ordinance" as "an authoritative decree or direction" or "a public enactment, or law promulgated by governmental authority," *Webster's Third New International Dictionary* 1588 (3d ed. 1961) ("*Webster's Third*"), and a "law" as "a rule or mode of conduct or action that is prescribed or formally recognized as binding by a supreme controlling authority or is made obligatory by a sanction (as an edict, decree, rescript, order, ordinance, statute, resolution, rule, judicial decision, or usage) made, recognized, or enforced by the controlling

authority," *id.* at 1279. In contrast, a restrictive covenant is a private agreement between a property owner and some other person interested in the property. For instance, the Ohio Supreme Court has defined a "restrictive covenant" as "[a] private agreement, usu. in a deed or lease, that restricts the use or occupancy of real property." *Canton v. State*, 766 N.E.2d 963, 969 (Ohio 2002). The Ohio Court of Appeals has stated flatly that "[i]n the law of real property, the term 'covenant' denotes a contract." *Maasen v. Zopff*, No. 98-10-135, 1999 WL 552747, at *3 (Ohio Ct. App. July 26, 1999). And covenants are also treated like contracts; for example, they are construed in large part in order to give effect to the intent of the creators. *See Brooks v. Orshoski*, 717 N.E.2d 1137, 1140–41 (Ohio Ct. App. 1998).

Furthermore, the district court properly held that the Ohio Administrative Code does not require State Farm to cover the replacement of the roof.[1] Section 3901-1-54(I)(1)(b) of the Ohio Administrative Code requires that "[w]hen an interior or exterior loss requires replacement of an item and the replaced item does not match the quality, color or size of the item suffering the loss, the insurer shall replace as much of the item as to result in a reasonably comparable appearance." The Wrights have presented scant evidence that the damaged wood shakes could not have been replaced with shakes that would result in a reasonably comparable appearance. The only evidence is the sworn statement of the Wrights' roofer, who expressed the opinion that "[b]ecause the roof was made from wood shakes and had changed significantly over the years, . . . the roof could not be repaired to match," and that therefore the Muirfield Design Standards and state law required replacement. The roofer is not an expert on state law, nor does he explain with

---

[1] Although the relevant section of the Ohio Administrative Code states that "[n]othing in this rule shall be construed to create or imply a private cause of action for violation of this rule," the Code nonetheless is intended "to set forth minimum standards for the investigation and disposition" of insurance claims. Ohio Admin. Code § 3901-1-54(B). Thus, the rules may provide evidence of industry practice relevant to construing an insurer's contractual obligations during the claims process, *see Dolecki v. Nationwide Mut. Ins. Co.*, No. 2004CA00063, 2005 WL 578648, at *4 (Ohio Ct. App. Mar. 7, 2005) (unpublished).

any specificity why the Ohio Administrative Code applies. And although unweathered shakes would not exactly match the color of weathered shakes, the roofer does not claim that replacement shakes would not match after weathering naturally. It is uncontested that unweathered replacement shakes, after a reasonable amount of time, would weather to match the old shakes. The district court could reasonably conclude that this would "result in a reasonably comparable appearance" and thereby satisfy the requirements of the Administrative Code. The district court was particularly justified in denying the Wrights' claim "in the absence of evidence of special circumstances regarding their particular roof," considering that to hold otherwise would—as the district court reasoned—create an extreme blanket rule requiring the entire replacement of any damaged shake roof.

Second, the district court properly dismissed the misrepresentation and bad-faith claims that were based on the theory that State Farm violated a duty to disclose to the Wrights the possibility that the homeowners' association might require the entire roof to be replaced if any part of it were damaged. The Wrights argue that State Farm, either as a matter of law or because of an implicit promise to act as a fiduciary, had a duty to inform the Wrights of the existence of any reasonably foreseeable, home-related, substantial expenditures that would not be covered by the policy. At the outset, it is unclear that State Farm should even be considered to have had knowledge of the Muirfield Design Standards. The Wrights' only evidence that State Farm knew about the design standards is the testimony of a claim team manager who may have inputted notes about previous roof-repair claims in the development. However, the Wrights cannot explain why State Farm's captive agent who sold the policy would have been aware of those discussion notes. And even if State Farm knew about the design standards, the Wrights have not demonstrated that State Farm should have advised the Wrights about them. There is

evidence in the record that demonstrates that the design standards did not present the significant likelihood of financial calamity that the Wrights claim they did. State Farm had not once before had a similar dispute regarding roof repair in Muirfield Village. In reviewing its records, State Farm "found no instance in which a roof that required only partial repair and not complete replacement was completely replaced because of the Muirfield Village Design Code."

The Wrights' argument relies extensively on their ignorance, for which the law in this context provides no excuse. The Wrights had at least a minimal duty to educate themselves about their homeowners' association's rules and the contents of their insurance policy. In Ohio, an insurance customer has a "duty to examine the coverage provided and is charged with knowledge of the contents of his or her own insurance policies." *Fry v. Walters & Peck Agency, Inc.*, 750 N.E.2d 1194, 1200 (Ohio Ct. App. 2001). Although the Wrights argue that they should not be charged with knowledge of the policy because they did not receive a copy of the policy until after the roof-damage claim, they cite no authority of Ohio law establishing such a delivery requirement—which would anyway appear to conflict with the affirmative duty of the customer to inform himself of the policy contents—nor have the Wrights presented any more than a speculative assertion that the policy was never delivered. Furthermore, the Wrights never requested or inquired about special coverage for the design standards, about which they confess to having no knowledge at the time they purchased the insurance. Generally, an insurance agent only has a duty to obtain insurance that a customer specifically requests. *See Island House Inn, Inc. v. State Auto Ins. Cos.*, 782 N.E.2d 156, 158 (Ohio Ct. App. 2002); *First Catholic Slovak Union v. Buckeye Union Ins. Co.*, 499 N.E.2d 1303, 1305 (Ohio Ct. App. 1986).

There is no colorable argument that there existed between the Wrights and State Farm a fiduciary relationship that would create a special duty to disclose. Mr. Wright met with Michelle

Nix once to obtain a standard homeowner's insurance policy. "Ordinarily, the relationship between an insured and the agent that sells the insurance is, without proof of more, an ordinary business relationship, not a fiduciary one." *Slovak v. Adams*, 753 N.E.2d 910, 916 (Ohio Ct. App. 2001). The Wrights point to no special circumstances about their relationship with Nix or the McClaskie Agency that would indicate that this was anything more than the typical insurer-insured relationship. Indeed, the interaction between Nix and Mr. Wright appears fairly routine, even cursory. In order to establish a fiduciary relationship, the Wrights would have to show that "both parties . . . understand that a special trust or confidence has been reposed." *Id.* at 917. The only case the Wrights can point to in support of the claim that State Farm has a fiduciary relationship with its customers, *Baughman v. State Farm Mut. Auto Ins. Co.*, No. 22204, 2005 WL 3556406 (Ohio Ct. App. 2005), bears little direct relevance to the Wrights' case. Whereas the present case involves a claim arising out of a covenant in a homeowner's property deed, the *Baughman* case involved a class action regarding knowledge of a generally applicable change in insurance law. And the precedential value of that case is small—the court held only that there was a triable issue of fact whether a fiduciary relationship existed. *See id.* at *5.

Finally, State Farm did not act in bad faith when it chose not to renew the Wrights' policy, because it complied with the terms of the policy regarding nonrenewal. The policy explicitly provided State Farm a right not to renew the policy, as long as it gave notice at least thirty days before the expiration of the policy. Regardless, there is no damage, since the Wrights were able easily to obtain comparable coverage with Liberty Mutual.

The law provides no protection for the Wrights failure to educate themselves about either the property or the insurance policy. State Farm complied with the terms of its contract. Therefore, all of the Wrights' claims were properly dismissed at summary judgment.

The district court's judgment is AFFIRMED.