**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0573n.06

**No. 17-3286**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 10, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN ABBOUD, Administrator of the Estate of Nahida Abboud, deceased, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| LIBERTY MUTUAL INSURANCE GROUP, INC., dba Liberty mutual Insurance; LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendants-Appellees. | ) | OPINION |

---

**BEFORE:    KEITH, McKEAGUE, and STRANCH, Circuit Judges**

**JANE B. STRANCH, Circuit Judge.**   Plaintiff Dr. John Abboud appeals from the district court's decision granting summary judgment in favor of Defendants Liberty Mutual Insurance Group, Inc. and Liberty Mutual Insurance Co. (collectively Liberty Mutual). Abboud appeals only the dismissal of his claim of negligent misrepresentation, in which he asserts that Liberty Mutual negligently represented that its umbrella liability policies would extend the Uninsured/Underinsured Motorist (UM/UIM) coverage already available as part of his underlying auto insurance policy. The district court determined that no trier of fact could find that Abboud had demonstrated the requisite element of justifiable reliance, and therefore held that his negligent misrepresentation claim failed as a matter of law. Because we find that the record reveals genuine issues of material fact as to Abboud's reliance on representations by

Liberty Mutual, we REVERSE the district court's decision and REMAND for further proceedings consistent with this opinion.

## I.        BACKGROUND

Abboud purchased an auto insurance policy from Liberty Mutual in 2011 after buying a BMW and learning about Liberty Mutual's special rates for BMW owners. At that time, Abboud purchased single limit coverage with a per accident liability limit of $1,000,000 and a per accident UM/UIM limit of $500,000. The liability coverage applied where someone insured under Abboud's policy was at fault, and the UM/UIM coverage protected Abboud and his family in the event of an accident where a third-party motorist with insufficient coverage was at fault.

In June 2012, Abboud received an unsolicited email from Liberty Mutual advertising Personal Liability Protection (PLP) or "umbrella" coverage. On August 9, 2012, Abboud called Liberty Mutual to inquire about the umbrella policy and to pay his auto insurance bill. He spoke with Daniel Fissel, a customer service representative licensed to sell insurance in the Commonwealth of Pennsylvania. Abboud recalls speaking with Fissel about incorporating a Liberty Mutual umbrella policy into his auto and home insurance policies. Abboud asserts that, upon Fissel's recommendation, he switched his auto insurance coverage from a single limit policy to split limit coverage, with the goal of adding an umbrella policy on top.

Fissel confirmed that it was his "habit and practice" to advise switching to split limit coverage, which is less expensive than a single limit policy. Where insureds had considerable assets, he would recommend this step in conjunction with the purchase of an umbrella policy "providing coverage over and above the coverage available under the insured's personal automobile and homeowner's policies." Fissel states that he "would not have recommended reduction of the insured's personal automobile insurance liability limits unless the insured was also purchasing a PLP policy to provide additional liability coverage." While Fissel does not

specifically remember speaking with Abboud in August 2012, his review of Liberty Mutual's system records cause him to "believe it probable that [he] would have discussed and recommended to Dr. Abboud the purchase of PLP insurance." By the end of their August 9 conversation, Abboud had a new auto insurance policy with split limit coverage of $250,000 per person/$500,000 per accident liability coverage and $100,000 per person/$200,000 per accident UM/UIM coverage. These limits represent the minimum underlying automobile coverage necessary to purchase and sustain a PLP policy with Liberty Mutual.

Fissel did not have the authority to sell umbrella policies, and Abboud remembers that Fissel then transferred him to another sales employee to continue discussing umbrella coverage. Abboud does not know the identity of the individual with whom he spoke about umbrella insurance that day, and Liberty Mutual's records do not indicate a second August 9 conversation. Liberty Mutual's business records do not show generation of an umbrella coverage quote for Abboud until November 21. A corporate witness clarified, however, that "Liberty [Mutual] does not maintain records of all calls between existing or potential customers and sales representatives. It is possible that a general information call could have taken place without any record being generated in Liberty [Mutual]'s computer system." A Liberty Mutual sales employee likewise confirmed that she had conducted informational calls that were not captured by Liberty Mutual's record/notation system.

Abboud ended his August 9 call with the understanding that he would be receiving umbrella coverage paperwork. Yet it was not until a November follow-up call that Liberty Mutual generated a quote for a PLP policy for Abboud and he actually purchased umbrella coverage with a policy limit of $2,000,000. This purchase was formalized when Liberty Mutual mailed Abboud an application form with pre-populated information. The section of the

application form regarding UM/UIM coverage was left blank. In response to the question, "UM Coverage? (where applicable)," neither the "yes" nor the "no" box is checked. The form also lacks responses regarding the "[u]nderlying UM limit $" and the "PCP UM Limits $." Abboud and his wife signed the application without adding any additional information, and the umbrella policy took effect on November 22, 2012.

The PLP policy enumerates some exclusions, including an exclusion for UM/UIM coverage "unless these coverages are specifically listed on your policy declarations." The second page of the PLP policy declarations lists Abboud's auto insurance policy, which included UM/UIM coverage, on the "underlying policy schedule." Somewhat circularly, the policy defines an "underlying policy" as "a policy listed as an underlying policy in the Declarations[.]"

Abboud read and understood both the PLP application and policy. He asserts that, based on his conversations with the Liberty Mutual employees, he understood that as long as he kept his "UM coverage under the underlying policy[,] that would be part of the umbrella to take effect." He states that he "expressed that [his] intent in purchasing the umbrella [coverage] was to increase the net coverage available for the coverages purchased under [his] auto and homeowner's policies, and [he] was informed the umbrella policy provided excess coverage for all underlying coverages." Abboud believed that the PLP policy incorporated his UM/UIM coverage despite the exclusionary language because that coverage is part of his auto insurance, which is listed in the policy declarations.

Abboud renewed his auto insurance policy in August 2013 and his umbrella policy in November 2013. In August 2014, while both of the renewed policies remained in place, Abboud's mother, Nahida Abboud, was out walking when she was struck by a third-party motorist. Mrs. Abboud suffered severe brain damage as a result of the accident. She ultimately

passed away after incurring over $1.5 million in medical expenses. The third-party motorist's insurance carrier tendered her liability limit of $100,000 without issue. Abboud then filed a UIM claim on behalf of his mother under both his auto and PLP Liberty Mutual policies. Because the third-party motorist's insurance carrier had already paid the equivalent of the UM/UIM limit in Abboud's auto policy, Liberty Mutual denied additional coverage under that policy. Liberty Mutual also denied coverage under the PLP policy, asserting that it did not include UM/UIM coverage.

At no point between 2012 and the present has Liberty Mutual sold UM/UIM coverage in Ohio under any type of policy other than auto policies. Liberty Mutual did not at the time of the accident, and does not now, include excess UM/UIM coverage in its Ohio PLP policies.

Abboud filed suit in the Court of Common Pleas in Summit County, Ohio, bringing claims of breach of contract, negligent/intentional misrepresentation, breach of fiduciary duty, and negligent hiring. Liberty Mutual removed the case to the Northern District of Ohio, and the district court granted summary judgment in favor of Liberty Mutual. The district court granted summary judgment on Abboud's negligent misrepresentation claim after determining that the plain language of the PLP application and policy covered losses only where Abboud or a family member was liable and specifically excluded UM/UIM coverage.[1] For that reason, the district court found that "any reliance on representations related to the PLP policy by an unidentified individual—in the face of the clear language of the policy—was not justified as a matter of law."

---

[1] Abboud asserts that he also appeals the district court's ruling on his "negligent advice" claim, but Abboud's complaint does not contain a cause of action for negligent advice. It appears that he is referring to his claim of breach of fiduciary duty, although he simultaneously states that he does not "assert on appeal" that a fiduciary duty existed. Accordingly, our review is limited to Abboud's negligent misrepresentation claim.

## II. ANALYSIS

We review grants of summary judgment de novo. *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Negligent Misrepresentation

Under Ohio law, the elements of a claim for negligent misrepresentation are as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989). The district court's decision turned on the issue of justifiable reliance.

Ohio courts have clarified that justifiable reliance differs from reasonable reliance. *Amerifirst Sav. Bank of Xenia v. Krug*, 737 N.E.2d 68, 88 (Ohio Ct. App. 1999), *cause dismissed sub nom. AmeriFirst Sav. Bank of Xenia, Ohio v. Krug*, 730 N.E.2d 384 (Ohio 2000). Rather than looking at the conduct of a reasonable person or applying a community standard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Id.* (citing Restatement (Second) of the Law, Torts, § 545A Cmt. b (Am. Law Inst. 1977)). To evaluate justifiable reliance a court "must consider the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances." *Johnson*

*v. Church of the Open Door*, 902 N.E.2d 1002, 1007 (Ohio Ct. App. 2008) (citations and internal quotation marks omitted).

Contrary to Liberty Mutual's assertions, this court's decision in *Wright v. State Farm Fire & Casualty Co.*, 555 F. App'x 575 (6th Cir. 2014), does not control our analysis. In *Wright*, the plaintiffs suffered roof damage during a storm. 555 F. App'x at 578. Their roof repair was subject to a number of deed restrictions enforced by their homeowners' association, one of which required them to replace the entire roof in the event of any damage. *Id.* at 577. The plaintiffs filed an insurance claim with their carrier, State Farm, for the cost of replacement. *Id.* State Farm denied the claim and reimbursed them for only a fraction of the cost on the grounds that the plaintiffs' policy covered only roof repairs, not replacement. *Id.* The plaintiffs filed suit, and their negligent misrepresentation claim failed because they did not identify a misrepresentation by the insurer. *Id.* at 577–78. The policy was silent on roof replacement, and the plaintiffs admitted that they did not even discuss the deed restrictions with the insurance agent when they purchased the policy. *Id.* at 577.

Liberty Mutual contends that, like the plaintiffs in *Wright*, "Abboud cannot identify any evidence that Liberty supplied him with false information for his guidance." But Abboud points to statements in the August 2012 call as the source of false information. He asserts that Fissel and the second Liberty Mutual sales employee with whom he spoke misrepresented the scope of umbrella coverage by telling him that a PLP policy would extend all of the limits in his underlying auto insurance policy. Abboud testified as to his recollection of his conversations with both Fissel and the unidentified sales employee. He also submitted an affidavit from Fissel setting forth his habits and practices, which are largely consistent with Abboud's recollection. This evidence is not negated by Abboud's inability to recall the second employee's name or by

the lack of a record of the second conversation, especially since Liberty Mutual has confirmed that their system would not necessarily have captured an informational call. Because he identifies misrepresentations by Liberty Mutual on which he relied, Abboud's claim is materially distinct from the situation in *Wright*.

Liberty Mutual emphasizes that Abboud is a well-educated cardiologist who understood the difference between liability insurance and UM/UIM insurance at all relevant times. Regardless of Abboud's professional status, it is not unjustifiable to rely on the statements of Liberty Mutual sales employees when considering the product they offer for purchase. Moreover, the question here is not how liability coverage differs from UM/UIM coverage, but rather whether Abboud was justified in believing that the latter type of coverage was encompassed by his umbrella PLP policy.

On this question, both Liberty Mutual and the district court found controlling the plain language in the PLP application and policy. We are not so convinced of its clarity, and we find this court's decision in *Greenberg v. Life Insurance Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999), instructive. There, an insurance agent told the plaintiffs, two sisters, that they could obtain a life insurance policy for their father by purchasing a single-premium policy. 177 F.3d at 511. The agent represented that, for a single payment, the sisters could maintain the policy during their father's lifetime without having to make additional premium payments. *Id.* Over a decade later, the sisters learned that they would need to make substantial additional payments to keep the life insurance policy in place. *Id.* The district court granted the insurer's motion to dismiss the sisters' negligent misrepresentation claim on the ground that the sisters' reliance on the agent's statements was unjustified in light of language in the policy itself, which warned of policy expiration absent additional premium payments. *Id.* at 516. This court reversed, noting

that at least some of the language in the policy was ambiguous with respect to the terms "single payment" and "single premium." *Id.* at 516–17. The panel's decision specifically noted "the internal inconsistencies in the policy language" when finding that the sisters had sufficiently alleged justifiable reliance. *Id.* at 516. Although we are considering justifiable reliance on a motion for summary judgment rather than on a motion to dismiss, the ambiguous language in the umbrella application and policy nevertheless supports the same conclusion: Confusing or ambiguous policy language may compound a prior misrepresentation and support a finding of justifiable reliance.

Here, Liberty Mutual completed the PLP application and sent it to Abboud with prepopulated information. Abboud understood the application to reflect his August and November 2012 umbrella coverage conversations with Liberty Mutual sales employees. In those conversations, the sales employees represented that the PLP policy would extend both the liability and the UM/UIM coverage. This understanding is supported by the application's express reference to Abboud's underlying auto insurance policy, which included UM/UIM coverage.[2] And although the application has blank spaces in the UM/UIM section, both the "yes" and "no" boxes were unchecked. The application cannot be construed as confirming the absence of UM/UIM insurance any more than it can be construed as indicating its inclusion.

---

[2] Contrary to the dissent's portrayal of the facts, Abboud did not concede he understood that the PLP language "did not support" his understanding of his umbrella coverage, Dissenting Op. at 14, nor did he acknowledge that Liberty Mutual's telephonic statements were "inconsisten[t] with the policy language," *id.* at 15. Rather, when asked at deposition if he understood from the PLP policy application that he was "not paying for UM[/]UIM coverage under [his] PLP policy," Abboud responded, "No. I did not understand it." Abboud went on to say: "It was my understanding that as long as I keep my UM coverage under the underlying policy that would be part of umbrella to take effect." Abboud read and understood the policy, but, as he has maintained throughout this litigation, he read and understood it to confirm the representations of Liberty Mutual sales employees.

Neither do we find the UM/UIM language in the PLP policy itself to be unambiguous. It excludes UM/UIM coverage except as "specifically listed on your policy declarations," and the policy declarations pages specifically list the auto insurance policy, which, in turn, specifically includes UM/UIM coverage. Abboud discussed with Liberty Mutual sales representatives his existing single limit auto policy providing UM/UIM limits of $500,000 and his intention to extend his coverage by converting to a $2,000,000 umbrella policy on top of a split limit auto policy. Abboud viewed the PLP paperwork through the lens of these conversations, leaving him with the impression that the umbrella coverage extended his entire auto policy, UM/UIM coverage included. In this way, too, the case before us is distinguishable from *Wright*. There, the insurance policy was completely silent on roof replacement. 555 F. App'x at 578. The policy at issue here is not silent on UM/UIM insurance—it creates space for reasonable minds to disagree.

Liberty Mutual stresses that the PLP is a personal *liability* policy, and therefore is necessarily and obviously limited to coverage for when Abboud or one of his insured family members is at fault. While this argument has facial plausibility, it ignores the fact that a PLP policy is designed to sit atop a variety of underlying policies, including auto policies that provide UM/UIM coverage. This supports our conclusion that genuine issues of material fact regarding Abboud's reliance on his phone calls with Liberty Mutual render summary judgment inappropriate. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017), *reh'g denied* (July 26, 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The district court's decision failed to consider the ambiguity in the PLP language and overlooked Abboud's consistent assertions

that his understanding of that language was guided by Liberty Mutual's representations regarding the scope of his coverage. This evidence, when properly considered and viewed in the light most favorable to Abboud, creates genuine disputes of material fact that should be presented to a jury. Accordingly, the district court's decision granting summary judgment on Abboud's negligent misrepresentation claim must be reversed.

### B.    Comparative Negligence

The parties also raise arguments regarding comparative negligence and cite caselaw addressing the extent to which an insured's failure to read an insurance policy bears on negligent misrepresentation claims. In *Amankwah v. Liberty Mutual Ins. Co.*, an Ohio Court of Appeals surveyed comparative negligence determinations in insurance procurement cases and found that whether comparative negligence must go to a jury varies based "upon the unique facts of each case." 62 N.E.2d 814, 817 (Ohio Ct. App. 2016). Many Ohio courts put the issue of comparative negligence to the jury, although some courts have resolved the issue upon a motion for summary judgment. *See Id.*; *see also Robson v. Quentin E. Cadd Agency*, 901 N.E.2d 835, 841–45 (Ohio App. 2008) (collecting cases sending comparative negligence to a jury).

The district court here held:

> Dr. Abboud testified that he read the PLP policies and understood that 1) the 2012 and 2013 PLP policies did not have the UIM coverage box marked; 2) he was not being charged a premium for UIM coverage under either PLP policy; and 3) UIM coverage was explicitly excluded under the language of both PLP policies. Therefore, there is no genuine issue of material fact as to comparative negligence, and Liberty is entitled to judgment as a matter of law.

*Abboud v. Liberty Mut. Grp., Inc.*, No. 5:15CV02344, 2017 WL 749182, at *7 (N.D. Ohio Feb. 27, 2017). We do not think that this paraphrasing accurately reflects the events that transpired. Abboud asserts that he read and understood his insurance policies, but that his understanding was guided by the misrepresentations made by Liberty Mutual sales employees. He did not say he

understood UIM coverage to be specifically excluded from the PLP policy. To the contrary, he thought that the PLP declarations incorporated his UM/UIM coverage by referencing his auto policy. Reasonable minds could disagree regarding the extent to which Abboud's own negligence contributed to the harm he alleges. The unique facts of this case therefore warrant sending the issue of comparative negligence to a jury along with Abboud's negligent misrepresentation claim.

### C. The Tape Recording

Finally, we pause to address the transcript of a tape-recorded conversation between Abboud and a Liberty Mutual employee in August 2014, just after his mother's accident. In the conversation, the Liberty Mutual employee enthusiastically confirms that Abboud's umbrella policy includes UM/UIM coverage. Abboud's attorney mailed the recording and a transcript thereof to Liberty Mutual just four days after the close of discovery. It seems likely that this four-day delay was harmless or that any potential harm could have been cured through limited additional discovery. Yet Liberty Mutual sought neither to reopen discovery nor to re-depose Abboud regarding this recording. Liberty Mutual instead filed a motion seeking the sanction of exclusion. The district court did not pass on the merits of the motion to exclude, but denied it as moot after determining that Liberty Mutual was entitled to summary judgment. Given the persuasive value of this recording and this panel's decision to remand the negligent misrepresentation claim, the district court should consider authorizing further discovery limited to the tape recording on remand.

### III. CONCLUSION

For the foregoing reasons, the district court should not have granted summary judgment in favor of Liberty Mutual on Abboud's negligent misrepresentation claim. We REVERSE the

judgment in favor of Liberty Mutual and REMAND Abboud's negligent misrepresentation claim

for further proceedings consistent with this opinion.

**McKEAGUE, Circuit Judge, dissenting.** My colleagues correctly recognize that the district court awarded summary judgment to Liberty Mutual for lack of evidence of an essential element of Abboud's claim, i.e., that he *justifiably relied* on a negligent misrepresentation allegedly made by an unidentified employee over the phone. Today we reverse the court's ruling without identifying what evidence could be deemed to render Abboud's reliance justifiable. Because I see no error in the district court's application of Ohio law to the record facts, I respectfully dissent.

The district court explained its reasoning with detailed references to Abboud's own deposition testimony. Abboud conceded that he read the provisions of the subject policies on receipt and understood that the language in those provisions did not support his claimed understanding that he is entitled to uninsured/underinsured motorist coverage. His asserted understanding, admittedly at odds with the policy language, is based on an alleged telephonic misrepresentation of an unidentified Liberty Mutual employee months before he received the first such policy.

Under Ohio law, "reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Lu-An-Do, Inc. v. Kloots*, 721 N.E.2d 507. 514 (Ohio App. 5th Dist. 1999). Here, Abboud himself admitted reading and understanding policy language that was directly at odds with what he says he was told over the phone, representing abundant reason to doubt the veracity of the oral representation. Yet, he accepted the policy and paid the reduced premium without making any further inquiry. I fail to see how this can amount to justifiable reliance under Ohio law.

In response to the motion for summary judgment, Abboud was obliged to come forward with *evidence*—more than a mere scintilla—tending to support a reasonable finding that his reliance on the telephonic representation was justifiable, despite his acknowledgement of its inconsistency with the policy language. In my opinion, the district court properly concluded that the record is devoid of such evidence and Abboud's appellate briefing has failed to expose any error in the district court's reasoning.

In reaching a contrary result, the majority has not identified the missing evidence. Rather, my colleagues have subtly reformulated the standard, observing that "it is *not unjustifiable* to rely on the statements of a Liberty Mutual sales employee" and that "the application cannot be construed as *confirming* the absence of UM/UIM insurance." Maj. Op. at 8–9, 10 (emphasis added). It seems to me the majority has effectively reversed the parties' burdens. In response to Liberty Mutual's motion, it is Abboud who has the burden of adducing evidence sufficient to create a genuine issue of material fact to forestall summary judgment—a burden he has not met. "No problem," says the court. Today we impose on Liberty Mutual, as a condition of affirming the award of summary judgment, the burden of showing that all possibility of Abboud's sustaining his claim in trial is foreclosed. That's just not how the summary judgment process, "a sort of trial on the paper record," is designed to work. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480–81 (6th Cir. 1989).

Accordingly, I respectfully **DISSENT**.